UNITED STATES of America, Appellee,

v.

Richard J. PICARIELLO, Defendant, Appellant.

No. 77–1139.

United States Court of Appeals, First Circuit.

Argued Nov. 10, 1977.

Decided Jan. 13, 1978.

Lewis S. Gurwitz, Boston, Mass., by appointment of the court, and Barry S. Gerstein, Cambridge, Mass., for appellant.

George J. Mitchell, U.S. Atty., Portland, Me., with whom Elizabeth M. Edson, Asst. U.S. Atty., Portland, Me., was on brief, for appellee.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, and GORDON,* District Judge.

BOWNES, Circuit Judge.

Defendant was convicted pursuant to 18 U.S.C. § 844(d) and 18 U.S.C. § 2 of transporting in interstate commerce explosives with the knowledge and intent that the explosives would be used to intimidate individuals and to damage and destroy buildings and other real and personal property. He appeals from that conviction on assorted grounds. We examine each in turn.

I.

Defendant asserts that a so-called "target list," which was seized from his apartment on July 4, 1976, and introduced at trial, was the result of an illegal search and seizure and, as such, should have been suppressed. The essential facts surrounding the seizure of the target list are as follows.

On May 11, 1976, the Central Maine Power Company in Augusta, Maine, was bombed; on July 1, bombs exploded in Massachusetts at Logan Airport, the Dorchester National Guard Armory, and the Newburyport Superior Courthouse. An explosion damaged the Post Office Building in Seabrook, New Hampshire, on July 2. In early May, approximately 1,200 pounds of explosives and between 150 and 200 pounds of electric blasting caps had been stolen from a firm in New Boston, New Hampshire. Sometime subsequent to the May 11 bombing, and after tentative witness identification of defendant, the F.B.I. began a surveillance of defendant's residence at 46 Cushman Street, Portland, Maine. On the evening of July 3, agents observed Picariello place a small attache case and a 12 × 12 × 18 inch box in a brown Plymouth. At approximately 10:05 P.M., Picariello and his codefendants, Joseph Aceto, Everett Carlson, and Edward Gullion (each tried separately) then drove off in two cars, Picariello as a passenger in the brown Plymouth. F.B.I. agents followed the Plymouth to Topsfield, Massachusetts where, at approximately midnight, defendant left the car; one of the codefendants, Aceto, continued in the Plymouth and a high speed chase resulted, during which the agents lost contact with the car. It was found abandoned several hours later at 5:30 A.M. on July 4, containing the attache case and the box and approximately 50 sticks of dynamite, blasting caps, two handguns and a shoulder weapon. The dynamite, it was subsequently determined, had the same marking and date-shift coding as the dynamite stolen from the New Boston, New Hampshire, concern in May.

The agents who discovered the abandoned Plymouth and the dynamite notified other agents in Portland, Maine. Starting at approximately 7:00 o'clock on the morning of July 4, agents in Portland started assembling together to assimilate the information they collectively had gathered and to decide on the proper course of action. Several agents were called at their homes early on that holiday morning and requested to report to the F.B.I. office; the United States Attorney was called; a policewoman from the Portland Police was telephoned. Agents who had been involved in the chase returned to Portland. During the briefings, the officers were informed of the events of the night before, of the bombings during

* Of the Eastern District of Wisconsin, sitting by designation.

the nights of July 1 and 2 and earlier in the spring, of the theft of the dynamite in May, and of the surveillance of defendant Picariello. At approximately 10:30 A.M. or 11:00 A.M. the United States Attorney and one of the F.B.I. agents began preparing affidavits and papers to obtain a search warrant for defendant's apartment at 46 Cushman Street.

█ It was decided that, while the papers were being prepared, agents should proceed to defendant's apartment and secure it, pending the arrival of the warrant. The lower court found that this action was taken for the purpose of determining whether there were any explosives on the premises which could pose a threat to public safety. After an evidentiary hearing on defendant's motion to suppress, the district court found that two F.B.I. agents and a woman police officer went to defendant's third floor apartment at approximately 11:55 A.M., knocked on the door, and were admitted by defendant's wife. The agents stated that they were there to secure the premises pending the arrival of a search warrant. The court specifically found that entry to be consensual. It further found that, other than an inspection of the premises for visible explosives, firearms, or suspects, there was no search until the warrant arrived at 2:40 P.M. The court also found that, while the agents were awaiting the arrival of the search warrant, defendant's wife was permitted to make and receive phone calls. During this time, a male friend came to wait with Mrs. Picariello; a small child accompanied by two teen-age girls had also been permitted to come and go. When the warrant arrived, a thorough search of the apartment was made and the target list was found and seized. A careful review of the record satisfies us that the district court's findings were not clearly erroneous, but were amply supported by the evidence. See United States v. Cepulonis, 530 F.2d 238, 243 (1st Cir. 1976).

Defendant argues that the agents "seized" the apartment illegally upon their initial entry at 11:55 A.M. and the subsequent search under warrant could not cure the initial illegality.

█ We note at the outset that warrantless entries are per se unreasonable unless they fall within narrowly recognized categories. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Two recognized exceptions are consent, Zap v. United States, 328 U.S. 624, 628, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946), vacated on other grounds, 330 U.S. 800, 67 S.Ct. 857, 91 L.Ed. 1259 (1947); United States v. Berkowitz, 429 F.2d 921, 925 (1st Cir. 1970); and exigent circumstances, Vale v. Louisiana, 399 U.S. 30, 34–35, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); McDonald v. United States, 335 U.S. 451, 454–455 (1948).

█ Defendant argues that the entry could not be inoculated against a Fourth Amendment claim by the consent exception. We note that a legitimate question of voluntariness might be raised by the circumstances here. A woman confronted at the door by three law officers, identified as such, who inform her that they are there to secure the premises while awaiting a search warrant, might well doubt her ability or right to withhold consent. However, we need not and do not decide the issue of whether the entry here was rendered immune to a Fourth Amendment attack because of Mrs. Picariello's apparent consent. The district court, while finding that the entry was consensual, held that the only exemption which applied to the initial entry was that of exigent circumstances. We agree.

The factual setting supports the finding of exigent circumstances. Starting with the May 11 bombing of the Central Maine Power Company, for which the Fred Hampton Unit of the People's Forces[1] had claimed responsibility, there followed a salvo of bombings on July 1 and July 2 in Massachusetts and New Hampshire. The

---

1. Codefendant Aceto, a major prosecuting witness, explained that the codefendants had adopted this self-styled name.

Fred Hampton Unit again claimed responsibility. On the evening of July 3 and the early hours of July 4, F.B.I. agents followed defendant Picariello and his codefendants from Maine to Massachusetts, engaged the car in which defendant had been riding in a high speed chase and shortly thereafter found the wrecked car with dynamite wired with timing devices and electrical plastic caps, ready for use as explosives.

A review of the record leads this court to conclude that the F.B.I. agents made a justifiable assessment of exigent circumstances in their decision to secure defendant's apartment pending the arrival of the search warrant. Only a portion of the dynamite which had been stolen in May had been recovered; several bombings had occurred; it was learned that the dynamite found in the abandoned Plymouth was of the same date-shift as that taken in the May theft. There was a very real threat posed by the remaining unrecovered dynamite. The agents had probable cause to believe that defendant was involved in the bombings and that the remaining explosives might be found stored at his apartment. Defendant had eluded the agents only hours earlier; his whereabouts were unknown. The volatile nature of the setting manifestly supports a finding of exigent circumstances.

This is not a case akin to the situation in *Niro v. United States*, 388 F.2d 535 (1st Cir. 1968), where agents for over twelve hours had probable cause for a search and seizure and nonetheless neglected to obtain a warrant. There, we held that the agents could not escape the warrant requirement simply to avoid the inconvenience of obtaining one. The case at bar is clearly distinguishable from *Niro*; here, agents acted with all reasonable dispatch in organizing the information necessary to underpin a warrant and in obtaining one. They then proceeded to the premises to await its arrival and made no search until after the warrant arrived.

This case falls within the ambit of our ruling in *United States v. Ferrara*, 539 F.2d 799 (1st Cir. 1976), where agents, observing what they believed to be criminal activity, waited until the next morning to obtain a warrant. Defendant here urges us to find that the F.B.I. agents had probable cause upon which to seek a warrant as early as 7:00 or 8:00 the morning of July 4. The agents did not go before a magistrate until four or five hours later. Agents who were off-duty had to be called at their homes early on a holiday morning; other agents had yet to return from their surveillance and pursuit of defendant which had started the previous evening. Data had to be compiled, sifted, and put into a satisfactory form; affidavits had to be prepared. In light of the situation, the lapse of four or five hours between the time when it was arguably first possible to obtain a warrant and the time the warrant was sought was reasonable.

Defendant presses us to hold that the Supreme Court decision in *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 359, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977), deprives the government here of the "exigent circumstances" exception. He argues that the delay between the time at which agents first had probable cause (approximately 7:00 A.M. or 8:00 A.M.) and the warrantless entry nearly five hours later eliminated the exemption. *G.M. Leasing* involved a forcible entry, a warrantless search, and a repeat of those acts two days later. The circumstances were rife with probable cause for a search warrant at least for two days prior to the second entry and yet no attempt was made to secure one. The Court found that in this context there were no exigent circumstances. We do not read *G.M. Leasing* so broadly as to require any delay, however slight and however reasonable in a given situation, to dissolve a finding of exigent circumstances. The emergency conditions existing on the morning of July 4 and the reasonable speed with which the agents acted substantiate a finding of exigent circumstances.[2]

---

2. The government, referring to our decision in *United States v. Berrett*, 513 F.2d 154 (1st Cir.

1975), has suggested that the agents' act of entering defendant's apartment to secure it did

■ Further pursuing his Fourth Amendment claim, defendant suggests that the warrant and supporting affidavits were defective for failure to state any fact from which an inference could be drawn that the property sought or the place to be searched lay on the "top floor apartment" of 46 Cushman Street (the residence of defendant). We find no support for defendant's argument; the affidavits and warrant more than sufficiently meet the requirement of specificity in identifying the defendant's residence on the top floor of 46 Cushman Street as the premises to be searched. *United States v. Ventresca*, 380 U.S. 102, 108–111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). The suggestion that probable cause did not underpin the warrant or affidavits is without merit. Having established probable cause to suspect defendant of involvement in the bombings, it was not unreasonable to expect that his apartment might contain explosives. *Brinegar v. United States*, 338 U.S. 160, 172–176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *United States v. Samson*, 533 F.2d 721, 723 (1st Cir.), *cert. denied*, 429 U.S. 845, 97 S.Ct. 126, 50 L.Ed.2d 116 (1976).

## II.

Defendant next advances the argument that the district court erred in not dismissing the indictment once testimony established that the dynamite in question had been destroyed by Massachusetts authorities on October 6, 1976, four months prior to trial. The first time defendant learned that the dynamite had been destroyed was on the tenth day of trial, January 27, 1977, during testimony by the Massachusetts expert who had detonated the deteriorating dynamite.

Testimony at trial revealed that the abandoned Plymouth, recovered on July 4, contained dynamite wired to timing devices and plastic caps. Explosives experts from Massachusetts and the F.B.I. were called to render the material safe, which they did. Subsequently, the dynamite was transported for safe storage by Massachusetts authorities to a magazine. Thereafter, the same Massachusetts explosives expert inspected the dynamite and, noting that it was dripping nitroglycerin, determined that it had deteriorated beyond the point where it could any longer be safely stored. He, therefore, destroyed the dynamite on October 6, 1976. The district court found that the destruction was done with permission of the Massachusetts state authorities and pursuant to state practice.[3] Other than two A.T.F. agents from the Boston office, there was no federal law enforcement official present. Specifically, no one connected with the prosecution of this case was involved.

■ When evidence in a criminal trial is destroyed, special scrutiny must be undertaken to ascertain whether defendant's right to due process has been prejudiced. A three-pronged examination is in order: first, was the evidence material to the question of guilt or the degree of punishment; second, was defendant prejudiced by its destruction; and third, was the government acting in good faith when it destroyed the evidence. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Heiden*, 508 F.2d 898, 902 (9th Cir. 1974); *United States v. Sewar*, 468 F.2d 236 (9th Cir. 1972), *cert. denied*, 410 U.S. 916, 93 S.Ct. 972, 35 L.Ed.2d 278 (1973); *United States v. Bryant*, 124 U.S. App.D.C. 132, 141, 439 F.2d 642, 651 (1971); *United States v. Keogh*, 391 F.2d 138, 147 (2d Cir. 1968). *See* Comment, "Judicial Response to Governmental Loss or Destruction of Evidence," 39 U.Chi.L.Rev. 542, 563–65 (1972).

---

not amount to a seizure. We find the facts in this case sufficiently distinct from *Berrett* to hold that a warrantless entry, adequate to invoke a Fourth Amendment claim, did occur. The *exigent circumstances doctrine* nonetheless transformed the entry into a permissible one.

3. State authorities properly had control and possession of the dynamite. Defendant and his codefendants were wanted by Massachusetts authorities at the time for the bombings in that state.

■ Proceeding in reverse order, there is no issue of bad faith by the federal law enforcement officials here and none was found by the lower court. In the first place, the government took no part in the destruction of the evidence, and, in the second place, the responsible state authorities acted to protect the public safety. This is not a case of government agents' rendering unavailable evidence of an exculpatory nature. *Compare Brady v. Maryland, supra.* The government, once informed that the evidence was no longer available, presented a valid nonpretextual explanation for its loss. *United States v. Augenblick*, 393 U.S. 348, 355–56, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). Specifically, it disassociated itself from any role in the dynamite's destruction.

We examine the questions of materiality and prejudice jointly. Defendant was convicted of transporting explosives across state lines with intent to harm or intimidate. There is no doubt, therefore, that the government had to prove that the dynamite was an explosive within the meaning of the statute. At the trial, defendant forwarded the argument that there was no clear proof that the dynamite would, in fact, explode. The district court properly rejected this argument. Expert testimony from F.B.I. agents at the scene of the wrecked Plymouth, as well as from Massachusetts state authorities, established that the dynamite was, in fact, capable of exploding. *United States v. Samson, supra*, 533 F.2d at 723. As a matter of fact, special explosives agents were required to render the dynamite safe for handling.

As to possible prejudice, we first note that defendant did not consider the existence of the dynamite an essential part of his defense until it was learned on the tenth day of trial that it had been destroyed. Defendant had been afforded the opportunity to inspect clocks, batteries, and tapes which had been retrieved with the dynamite. Furthermore, the government acknowledged that it had found no fingerprints on the dynamite.

Had a question been raised as to whether, in fact, any dynamite had been recovered from the Plymouth, we would be faced with a very different issue. Here, however, defendant does not contest the uncontroverted testimony that dynamite was taken from the Plymouth, transported to a Massachusetts magazine for storing, and subsequently destroyed. The record reveals no prejudice in fact to defendant by the dynamite's destruction.

Defendant urges us to find that the destruction of evidence by the Massachusetts authorities, without more, establishes prejudice as a matter of law. Defendant refers us to a recent unreported case, *United States v. Hawk*, Nos. 76–1906 and 76–2127 (9th Cir. July 26, 1977), *rehearing en banc*, Nov. 9, 1977, as the sole support for this claim.[4]

■ We note at the outset that *Hawk*, a 2–1 decision, has been withheld from publication and was reopened on October 17, 1977. The case was submitted for argument to the court sitting *en banc* on November 9, 1977. We next observe that *Hawk* seemingly runs counter to the prior law of the Ninth Circuit, which had required a showing of bad faith on the part of the government or a showing of prejudice to defendant. *United States v. Heiden, supra; United States v. Sewar, supra.* There are also two key distinguishing factors between *Hawk* and this case. First, there was no finding that the dynamite destroyed in *Hawk* was in a dangerous condition; the lower court specifically found that it would have been possible to store the dynamite safely. The dynamite in the instant case had been found unsafe for continued storage. A second distinguishing factor is the degree of involvement by federal officials found by the majority in *Hawk* (a finding energetically contested by the dissenting judge). In *Hawk*, the majority found that federal agents were active participants in the destruction and were thus chargeable for the act. There was no such participa-

4. °At oral argument, defense counsel indicated that *Hawk* should properly be cited *Loud Hawk*; for clarity's sake, we cite it as *Hawk*, the way it appears in the unpublished opinion.

tion by the federal government in the case at bar. Indeed, the prosecutor learned of the destruction simultaneously with the defense. The presence of two Boston-based A.T.F. agents does not warrant a finding that the federal government was a partner in the destruction.

We are not inclined to view *Hawk* as persuasive authority. Even were we to do so, however, defendant would find no comfort therein. Defendant's case is easily distinguishable.

JUDGMENT AFFIRMED.