161 N.J. Super. 524 (1978)
391 A.2d 1275
STATE OF NEW JERSEY, PLAINTIFF,
v.
DAVID JOSEPH GALVIN, DAVID PATRICK GALVIN, DORIS ROCCHETTI AND LOUIS ROCCHETTI, DEFENDANTS.
Superior Court of New Jersey, Law Division  (Criminal).
Decided July 21, 1978.
*527 Mr. John B. Dwyer for defendants David Joseph Galvin and Doris Rocchetti (Messrs. Claudat & Dwyer, attorneys).
Mr. Alexander W. Booth, Deputy Public Defender, for the defendant David Patrick Galvin (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Arthur J. Abrams for defendant Louis Rocchetti (Messrs. Abrams & Wofsy, attorneys).
Mr. Francis DeStefano, Assistant Prosecutor, for the State (Mr. James T. O'Halloran, Prosecutor of Hudson County, attorney).
THURING, J.S.C.
Defendants move to suppress evidence of narcotics and bookmaking seized in their second-floor *528 apartment at 602 Paterson Plank Road, Union City, New Jersey on February 2, 1977. A search warrant for the first-floor apartment of the same premises was issued by Municipal Judge Joseph Farrell on the basis of an affidavit submitted by Detective Charles Kohrherr of the narcotics squad. He was the only witness produced at the hearing.
The affidavit for the warrant recited that Kohrherr received certain information from a Detective Roth of the Jersey City Police Department which information Roth had received from a reliable informant. The informant had observed David Galvin [Sr.] selling percodan pills and liquid demerol (both controlled dangerous substances), at the premises described in the warrant. The informant told the officer that Galvin lived in the first-floor apartment and that narcotics were located in the front bedroom closet of those quarters inside a suitcase.
Kohrherr in his affidavit further stated that an investigation conducted by members of his department confirmed the fact that Galvin did live at the address given by the informant. Kohrherr knew Galvin from prior criminal involvement.
The affiant personally visited Galvin's suspected address and found located there a tavern on the ground floor, an apartment above the tavern ostensibly occupied by one named "Rocchetti" and another apartment on the top floor. The name "Rocchetti" had surfaced in previous narcotic investigations.
The witness testified that he and other officers in the early evening hours went to the apartment above the tavern to execute the warrant. They knocked on the door and were met by a Joseph Rocchetti. The officers identified themselves, informed Rocchetti of the warrant, and he permitted the officers to enter.
Rocchetti then advised the officers that Galvin frequently visited his apartment but that he actually lived with Rocchetti's sister, Doris in the top-floor apartment. Upon learning that the suspect lived upstairs the officers hastily *529 searched Rocchetti's apartment and then proceeded to the next floor. Two officers remained in Rocchetti's apartment. As the officers moved upstairs they passed a person later identified as David Galvin, Jr., also a defendant, who was on his way down the stairs. Kohrherr testified that he feared the possibility of a "tip-off" to the upstairs occupants so all officers moved with dispatch to secure the top-floor apartment. It was their intention, he stated, to enter without searching the apartment until a search warrant for that apartment could be obtained.
The officers' knock on the second-floor apartment door was answered by a woman whom Kohrherr knew from previous narcotics arrests. He asked the woman if Doris Rocchetti or David Galvin were there and received the response indicating that they lived there but were not then at home. When Kohrherr informed her that he fully intended to obtain a warrant to search the apartment, the girl backed away from the door and the officers entered. Several persons sitting in the kitchen were instructed by the officers to stay where they were.
The officers remained in the same room and did not search the apartment except for one detective, who, in order to insure their safety, peered into the other rooms. Kohrherr recalled seeing a bottle of pills in plain view in the kitchen.
Very shortly after entering the apartment the telephone rang. Kohrherr answered it. He testified he did so to prevent anyone in the room from informing the defendant Galvin, Sr. or anyone else of the officers' presence. Upon answering the phone a male voice on the other end asked if this was "Bobby." Detective Kohrherr replied "Yeah," and the caller then stated he would be sending a "guy and a girl over to pick up the suitcase."
Kohrherr attempted to telephone Judge Farrell at his home to obtain oral authorization to search, but received no answer. He immediately dispatched an officer to the judge's home. In the meanwhile the phone rang again. The same voice, identifying himself as "Red," said the girl had told him *530 there were a bunch of "cops" around. Kohrherr responded that the "cops" were involved downstairs and that everything upstairs was all right.
Two additional telephone calls were received at the apartment by Kohrherr, with the sequence of the calls not completely clear. The detective's recollection was that the third telephone call was from Judge Farrell. However, his sequence was probably in error since the judge's affidavit cites three phone conversations Kohrherr had with the unknown caller. In any event, Kohrherr received a third call from "Red" inquiring if the girl had arrived. When told "No" the caller stated he would come himself. Defendant Galvin, Jr. arrived in the apartment while the officers were awaiting authorization to search.
Judge Farrell, on the basis of the information contained in the original warrant, the detective's conversation with Rocchetti in the first-floor apartment and the telephone calls to the upstairs apartment, orally issued a warrant to search the apartment.[1] In the front bedroom closet a suitcase was found containing narcotics. Following the search David Galvin, Sr. appeared at the apartment. He admitted that the bedroom in which the suitcase was found was occupied by him.
The State argues that the search was valid based upon the information contained in the affidavit, that received in the execution of the initial search warrant, and on the right of the police to go to the second-floor apartment to secure it while awaiting approval of the telephone warrant. Based on exigent circumstances, they contend their actions were reasonable in order to prevent the potential destruction of vital but disposable evidence of criminality.
Defendants raise several objections, seriatim, to the police conduct. They contend, first, that the initial warrant for *531 the first-floor apartment was invalid because of insufficiencies in Detective Kohrherr's affidavit. They argue that there was no corroboration of the informant's tip in that Kohrherr, when he personally checked the premises at 602 Paterson Plank Road, found no apartment listed for Galvin but only to a Rocchetti to whom the informant had made no reference. In addition, defendants argue that the affidavit contained no valid statement as to the reliability of the informant. Any reference to reliability, defendants contend, was improperly considered by the issuing judge because it was based on the hearsay statement of a police officer different from the affiant. Defendants' position apparently is that Kohrherr, having no personal knowledge of the informant's reliability, could not swear to it in the affidavit. From this they urge that the entire police conduct was tainted by the illegal initial entry into the first-floor apartment on an invalid search warrant.
Secondly, defendants assert that even assuming the initial warrant lawful and proper, that warrant did not authorize entry into the second-floor apartment. Such argument is based on the ground that the error in the warrant was not merely technical in nature, but was based on incorrect information provided by the informant. Thirdly, defendants argue that the conversation with Rocchetti in the first-floor apartment did not independently give rise to a finding of probable cause for the officers to go upstairs to the top-floor apartment. Their contention is that probable cause to believe the second-floor apartment might contain evidence of crime did not exist until after Kohrherr overheard the telephone calls in that apartment. He, they state, had no valid initial right to enter the apartment in order to receive those calls. Lastly, defendants argue that there were no exigent circumstances justifying the warrantless entry into the second-floor apartment. The legality of the telephonic authorization by Judge Farrell is not questioned. State v. Cymerman, 135 N.J. Super. 591 (Law Div. 1975).
The court will address defendants contentions in the order presented. With respect to the initial entry into *532 the first-floor apartment and defendants' assertion of taint precluding use by the State of any subsequently obtained evidence under Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the court finds that the entry into the first-floor apartment was legally proper since it was based on a validly authorized search warrant.
Search warrants are favored and where challenged the burden is on defendants to establish their illegality. R. 3:5-7. State v. Singleton, 158 N.J. Super. 517, 525 (App. Div. 1978). In State v. Kasabucki, 52 N.J. 110 (1968), the court recognized that
When a police officer seeking a search warrant presents the basis therefor in affidavit form to a judge for evaluation on the issue of probable cause, the judge's approach must be a practical and realistic one. The officers statements must be looked at in a common sense way without a grudging or negative attitude. There must be an awareness that few policemen have legal training and that the material submitted to demonstrate probable cause may not be described with the technical nicety one would expect from a member of the bar. * * * Once the judge has made a finding of probable cause on the proof submitted and issued the search warrant, a reviewing court, especially a trial court, should pay substantial deference to his determination. [at 117]
Bearing these general principles in mind, the court turns specifically to the underlying affidavit. It is based primarily on information provided through a confidential informant. The United States Supreme Court in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), established a two-pronged test by which to judge the sufficiency of such information. First, the underlying circumstances upon which the informant's conclusions are based must be known, i.e., the information must not be based on mere rumor or hearsay. Second, the police officer must have some basis to believe that the informant is credible and his information reliable. Id., at 114, 115, 84 S.Ct. 1509. Where the Aguilar standards are not satisfied the court must examine the corroborating circumstances in determining *533 whether to accept the tale of the informant. State v. Ebron, 61 N.J. 207 (1972).
In the present case the two-prong test of Aguilar was clearly met. The affidavit reveals that the informant had knowledge of the criminal activity through personal observation. The issuing judge therefore could reasonably have found that the informant's information was trustworthy. It should also be noted that the informant had proved reliable in the past.
Defendants' objection to the hearsay statement in the affidavit relative to the past reliability of the informant is countered by the well-settled principle that the use of hearsay may support the issuance of a search warrant. State v. Kasabucki, supra, 52 N.J. at 117. In Kasabucki the prosecutor received a copy of a letter from a superior officer in the New York City Police Department reciting that he had received confidential information about a specified phone and address listed to Kasabucki who was alleged to be using his home for illegal gambling purposes. A prosecutor's investigator verified the address and phone listing. Later he called the defendant on the phone in an attempt to place a bet, but the defendant became wary and refused to accept the wager. The investigator prepared an affidavit and obtained a search warrant on the basis of this information. The search was upheld.
With respect to the hearsay information received from New York the court stated that it was reasonable to assume that the letter was not an "idle gesture," that it had a "ring of authenticity," that the information contained therein was "substantial and reliable" and that the investigator's follow-up inquiry provided sufficient corroboration. Id. at 120.
The facts and circumstances of the present case are closely analogous. They provide an even stronger basis for crediting the information relayed to Detective Kohrherr by Detective Roth. In both cases the information came from a parallel law enforcement agency. The relationship of the relator to the receiver of the information in the present case was much *534 more reliable, since the information came from a fellow officer in a neighboring town who transmitted the data personally to Kohrherr. In both cases the respective detectives were able to verify and corroborate the information. Kohrherr, as previously stated, knew Galvin, Sr. from defendant's past criminal involvement, and was able to point to a previous police investigation indicating that Galvin in fact lived at the address received from Roth. So too, Kohrherr's physical check of the address uncovered the name of "Rocchetti," a name that had surfaced in previous narcotic investigations. The information imparted to Kohrherr by Roth was far more substantial in quality than that provided by the out-of-state police in Kasabucki. The report in that case had given no indication of the kind or source of the confidential information, whereas in the present case the information clearly originated from personal observation by a proven reliable informant.
As in Kasabucki, the issuing judge here had a reasonable basis for finding the information substantial and reliable. In his workaday experience in combatting and preventing crime a police officer must of necessity, and constantly does, rely on information and tips passed on to him from other officers. Cf. State v. Lakomy, 126 N.J. Super. 430, 432 (App. Div. 1974).
The court concludes that the officers were where they were entitled to be when they entered the first-floor apartment. The Wong Sun doctrine of taint does not attach. Up to this point the police had not engaged in any illegal activity under the Fourth Amendment.
Since the police entry of the second-floor apartment was initially effected without a search warrant, the burden is upon the State to justify their actions by a preponderance of the evidence. State v. Whittington, 142 N.J. Super. 45 (App. Div. 1976). Simply stated, the question is whether the officers had probable cause under the circumstances to enter Galvin's apartment without a search warrant. It is obvious that the officers either first went to the wrong apartment, *535 that the elder Galvin had changed his living quarters or had removed the suitcase to what he thought was a safer place without changing apartments. Admittedly the warrant did not contain a mere technical error or irregularity in the description of the apartment. See R. 3:5-7(d); State v. Wright, 61 N.J. 146 (1972). It is equally clear that the initial search warrant did not authorize entry into the second-floor apartment. Accordingly, there must be demonstrated to the court sufficient facts subsequently obtained before the search itself took place which, when evaluated with the information contained in Kohrherr's affidavit, would create a probable cause belief that contraband most likely would be found in the second-floor apartment.
The concept of probable cause is not a technical one. It is a belief which arises reasonably from the facts and circumstances upon which a prudent man would act. State v. Davis, 50 N.J. 16, 23-24 (1967). In assaying the existence of probable cause to act a police officer's specialized experience should be taken into account, and not simply given grudging recognition by the court. State v. Sheffield, 62 N.J. 441, 445 (1973).
The court is satisfied that the requisite probable cause to enter the second-floor apartment has been established based on the additional information supplied by Rocchetti which led the officers to the contraband's true location. Rocchetti, in addition to informing the police that Galvin, Sr., for whom they specifically were looking and to whom the confidential informant specifically had referred, lived in the top-floor apartment with his sister, also told the police that Galvin frequented Rocchetti's first-floor apartment.
The information provided by Rocchetti may be likened to that of an informer and therefore should appropriately be evaluated under the two-prong Aguilar standard. The first prong clearly is satisfied. It is manifest from the very nature of the information provided that Rocchetti was speaking from personal knowledge. With respect to the second prong touching on Rocchetti's reliability, the State *536 asserts that he should be classified as a citizen informant who requires no past record of reliability or other corroboration. State v. Kurland, 130 N.J. Super. 110, 114, 115 (App. Div. 1974). Defendants, on the other hand, argue that Rocchetti's status was that of a confidential informant or that of a possible accomplice seeking to shed responsibility, and therefore his statement to the police required corroboration as to its reliability.
The court need not resolve this question since in either event there existed sufficient extrinsic circumstances to corroborate the information. First is the fact that it was Rocchetti's sister with whom Rocchetti said Galvin, Sr. lived. That statement lends authenticity and credibility to his representation. In addition, Rocchetti's information was corroborated by the girl who opened the second-floor apartment door and whom Kohrherr knew. Cf. State v. Royal, 115 N.J. Super. 439, 441 (App. Div. 1971). She affirmed that while not presently there, Galvin and Rocchetti's sister did in fact live in that apartment. Moreover, the affidavit supported by the previous police investigation submitted for the warrant to search the first-floor apartment showed that Galvin, Sr. was a resident at the premises in question. The fact that the confidential informant seemingly had pinpointed the wrong apartment does not irretrievably denigrate from his reliability or impair the remainder of the information contained in the affidavit. When combined with all the other information at the officers' disposal, the informant may simply have confused the location of the respective apartments. More likely, the illicit transaction with Galvin may well have occurred in the first-floor apartment during one of Galvin's frequent visits, with Galvin returning to his own apartment upstairs after the informant left. Given the fluid living arrangement between the apartments, the alleged inconsistencies challenging the informant's trustworthiness becomes de minimus.
The court having resolved the issue of probable cause to believe that contraband was located in the second-floor apartment *537 favorably to the State the question remains whether the police were authorized without the search warrant to enter to secure such apartment.
In State v. Fenin, 154 N.J. Super. 282 (App. Div. 1977), the police received information from an arrested informant, who sought favorable treatment, that a month earlier he had purchased "15,000 T.H.C. (tetrahydrocannibinal) pills" from defendant at defendant's apartment. Through a phone call made by the informant to defendant, the police determined that defendant still had narcotics in his apartment. Police officers entered to secure the living quarters of defendant while awaiting the arrival of a search warrant. No search took place until after the warrant arrived at defendant's premises. The trial court's suppression of the evidence was reversed.
The reviewing court noted, but did not address, the State's argument that entry was proper based on exigent circumstances. Instead, the court held that even if the State had entered illegally (a finding it did not make), there was no connection under Wong Sun, supra, between the discovered evidence and the entry. State v. Fenin, supra at 287. The court emphasized that none of the evidence seized was discovered upon the initial entry and that the initial entry was not linked in any way to the grant of a valid search warrant. Id. at 290.
State v. Fenin, supra, offers an attractive alternative to the exigent circumstances issue. However, in the present case the second search warrant and part of the discovered evidence was at least to some extent linked to the initial entry. The telephone calls received in the apartment were relayed to the issuing judge and at least one bottle of suspected pills was discovered in plain view in the kitchen.
Arguably, this court could rule that probable cause existed for the search warrant completely independent of the telephone calls and suppress the single bottle of pills discovered prior to the arrival of the warrant. This would, as in Fenin, remove any problem as to "taint," but the court chooses *538 instead to squarely address the issue as to the existence of exigent circumstances.
The concept of exigent circumstances authorizing a warrantless entry into a home must be applied with great circumspection. See, e.g., State v. Sims, 75 N.J. 337, 355 (1978); United States v. Picariello, 568 F.2d 222 (1 Cir.1978); United States v. Flickinger, 573 F.2d 1349 (9 Cir.1978), cert. den. ___ U.S. ___, 99 S.Ct. 119, ___ L.Ed.2d ___ (1978).
In State v. Miller, 159 N.J. Super. 552 (App. Div. 1978), a robbery and murder had taken place in a photographic studio. A subsequent search of a rooming house produced the guns used in the murder. The police had been admitted to the apartment by a girl who identified herself as a cousin of Miller and a girlfriend of his accomplice. She told the police that all three lived together in the rooms. The court upheld the seizure of the weapons found in the room on the theories of consent and exigent circumstances. It reasoned that the seriousness of the crime, the necessity of protecting the public by retrieving the weapon and the possibility that the girl, alone of the three not in custody, would endeavor to dispose of the guns was sufficiently exigent to support the action taken by the officers. The court stated:
Assuming that there is probable cause to believe that evidence may be found, exigent circumstances justifying a warrantless search exist when such evidence will likely be lost if police first had to obtain a search warrant. [at 559]
Compare, In re Kwok v. Mauriello, 43 N.Y.2d 213, 401 N.Y.S.2d 52, 371 N.E.2d 814 (Ct. App. 1977) (where the court in suppressing evidence of weapons from defendant's apartment after his arrest emphasized that the State had made no reasonable showing whatsoever that the weapons were likely to be removed by possible third persons).
In United States v. Picariello, supra, a series of bombings took place after significant amounts of explosives were stolen from a Boston munitions firm. The police began a surveillance of defendant's residence in Maine. On the *539 evening of July 3 the agents observed defendant place a small attache case and a 12 x 12 x 18-inch box in a brown Plymouth. Defendant and two codefendants left the area in two cars with defendant a passenger in the Plymouth. The police followed. Near midnight defendant got out of the Plymouth. One of the codefendants resumed driving the Plymouth which ultimately became involved in a high-speed chase during which the agents lost contact with the vehicle. The car was found abandoned several hours later. It contained the attache case, the box, 50 sticks of dynamite and other explosives. Early in the morning the agents gathered at police headquarters in Portland, Maine, where a United States attorney and one of the FBI agents began preparing affidavits and papers to obtain a search warrant for defendant's apartment. While the papers were being processed for a search warrant several agents went to defendant's apartment, entered and secured it. Other than a visual inspection for visible explosives, firearms or suspects, no search of the premises took place until after arrival of the warrant.
The First Circuit upheld the entry as based on a reasonable assessment by the agents as to the existence of exigent circumstances to prevent the removal or loss of evidence which included the suspected explosives. Id. at 225-26. The court noted that only a portion of the dynamite had been recovered and that defendant had eluded the agents only hours earlier. It rejected defendant's argument that the agents had created their own exigency and had ample time to first obtain a warrant. The court emphasized that the agents had "acted with all reasonable dispatch in organizing the information necessary to underpin a warrant and in obtaining one." Id. at 226.
Both Miller and Picariello, supra, admittedly involved exigency in relation to weapons and crimes of violence. However, while such circumstances create one class of exigency, the concept of required immediate action to prevent a loss of evidence is not limited to so narrow a context.
*540 In United States v. Flickinger, supra, the Ninth Circuit upheld a finding of exigency with respect to a feared imminent removal or destruction of controlled dangerous substances in a dwelling. In Flickinger the police had for several weeks conducted a surveillance of defendant's home for his suspected participation in a large scale conspiracy and drug ring. Events came to a fast-moving climax following an airplane drop from defendant's airplane and the seizure of two codefendants in two pickup trucks with 31 sacks of marijuana. Several agents returned to defendant's home at about 5:30 a.m. A third pickup truck was in the driveway. At 6:30 a.m. the agents entered without a warrant and found incriminating evidence.
The Court of Appeals specifically found exigency from the danger of a warning call to defendant notifying him that his codefendants were in custody and of his own pending plight of arrest. The court considered the danger of warning the defendant critical, and although admitting it a close question, held that the danger of the loss of evidence justified the police action. Id. at 1356-57.
In Gardner v. United States, 553 F.2d 946 (5 Cir.1977), cert. den. 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978), a warrantless entry into the home of defendant, who was arrested as he walked outside, was held to be justified by a fear that CDS contraband might be destroyed by another person who an informer said was still inside the premises.
And in Glazner v. Florida, 341 So.2d 1091 (Fla. Ct. App. 1977), cert. den. 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977), the court held that information in the hands of police officers that a large quantity of narcotics was about to be removed from a residence under surveillance authorized a warrantless entry. The decision was bottomed on the premise that there was presented a real risk that defendant would be warned by an unarrested third person aware of the police presence which could result in the destruction of the evidence.
*541 In the present case exigent circumstances justified the warrantless entry by Detective Kohrherr and his fellow officers in order to secure the apartment. Having executed the first validly authorized search warrant at Rocchetti's apartment the officers had effectively made public their presence and ran a potentially real danger that they had been discovered, either by someone in the second-floor apartment, as in Gardner v. United States, supra, or by someone in the street who could then telephone a warning, as in Miller, Picariello and Flickinger, supra. Indeed it is inferable that some type of warning of the police officer's presence occurred in this case as evidenced by the phone calls received by Kohrherr after he entered the second-floor apartment. It was then that the caller unknowingly advised Kohrherr of the officers' presence in the building. Given the ease with which narcotics are disposed of, it was not feasible for the officers simply to have staked out the apartment while awaiting the warrant. Such action might in some cases be called for where large and not easily disposed of objects are suspected to be within the apartment such as typewriters, stolen appliances or other large sized contraband. Reported cases are legion where criminals have been caught attempting to flush narcotics away. See, e.g., State v. Royal, supra; United States v. Fair, 176 F. Supp. 571 (U.S.D.C. 1959). Under the circumstances here present the officers made a reasonable assessment leading to the decision to take immediate action to preserve the status quo.
They did not, as contended by defendants, create their own exigency after the fact. Defendants point to the officers' passing Galvin, Jr. as he was walking downstairs during their ascent to the second-floor apartment. This, they say, reflects the fact that the officers themselves did not believe that exigent circumstances existed. The surrounding facts, however, do not support such an inference. First, the officers did not know Galvin, Jr. At that time they had no reason to suspect his involvement from his mere presence on the stairwell. State v. Sims, supra, 75 N.J. at 350, 352, n. 3. *542 Second, the officers were looking for Galvin, Sr., whom they did know. They were interested only in locating him and in securing the apartment attributed to him. They were not interested in an unknown person leaving the area, who could pose no threat once the apartment was secured.
The exclusionary rule is designed to deter insolence in office by law enforcement officials. Absent such unreasonable conduct there is little utility in suppressing evidence of illegal activity. United States v. Calandra, 414 U.S. 338, 347, 94 S.Ct. 613, 617-618, 38 L.Ed.2d 561 (1974). In the present case the officers' good faith is plainly manifested by their initial diligent conduct in obtaining a valid search warrant before proceeding to the premises.
Moreover, their conduct was no more intrusive than necessary under the circumstances. They reasonably could have concluded that a stake-out would prove unfeasible. Inside the apartment they made no search until after arrival of the warrant. Their brief look into the other rooms was clearly justified by the need to make sure there were no third parties who might prove a danger either to the officers or to the loss of the suspected contraband. State v. Smith, 140 N.J. Super. 368 (App. Div. 1976). And their brief detention of the apartment's occupants to maintain the status quo while securing the apartment invaded none of defendants' constitutional rights. State v. Walton, 159 N.J. Super. 408 (App. Div. 1978). Having discovered that Galvin, Sr. in fact was not then in the apartment, Kohrherr's receipt of the incoming telephone calls was appropriate to forestall any warning to him. The detective, being in the apartment legally, was justified in moving to intercept the calls. State v. Vizzini, 115 N.J. Super. 97, 101 (App. Div. 1971).
In sum, the factual mosaic here presented satisfies the court that the actions of the officers were proper in all respects. There exists no reason to withhold the assessment of credibility to the testimony of Kohrherr. Evidence of police respect for the need for a warrant before searching the second floor apartment, when taken with the urgent *543 necessity for action to preserve the status quo until the arrival of authorization to proceed, endows their conduct with legitimacy.
Accordingly, the motions of all defendants to suppress the evidence is denied.
NOTES
[1] The judge subsequently signed a formal search warrant form on February 7, 1977, nunc pro tunc.