173 N.J. Super. 440 (1980)
414 A.2d 576
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
KEITH MEIGHAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 1, 1980.
Decided April 22, 1980.
*443 Before Judges FRITZ, KOLE and LANE.
Harvey S. Grossman, Deputy Public Defender, argued the cause for appellant (Stanley C. Van Ness, Public Defender, attorney; Stanford M. Singer, Assistant Deputy Public Defender, of counsel and on the brief).
Debra L. Stone, Deputy Attorney General, argued the cause for respondent (John J. Degnan, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by KOLE, J.A.D.
Initially charged with murder while armed and possession of a controlled dangerous substance, in accordance with a plea agreement defendant pleaded guilty to manslaughter of Raoul Coleman and possession of over 25 grams of marijuana. That agreement contemplated that defendant would be sentenced to a term not exceeding 10 years for manslaughter, that the sentence for the marijuana offense would be concurrent with that for manslaughter and that it be recommended that the sentences be served at the Youth Correctional Institution Complex. The trial judge imposed concurrent terms in State Prison of 5 to 10 years for manslaughter and 2 to 4 years for possession of marijuana, with a recommendation that the terms be served at the Youth Complex. Defendant's motion for reconsideration of the sentences was denied. Prior to entry of his pleas, defendant's motion to suppress evidence had been denied. Defendant appeals.
The following contentions are raised on this appeal. (1) The court erred in denying defendant's motion to suppress evidence: (a) the warrantless search of defendant's wife, Dorothy Meighan, was unconstitutional and (b) by failing to investigate the circumstances relating to the issuance of the search warrant for defendant's home, the court improperly upheld the search pursuant *444 to the warrant. (2) The court erred in sentencing defendant and in refusing to modify the sentence imposed.
From the plea proceedings the facts that follow support the manslaughter charge: On July 29, 1977 defendant's brother Bert came home in a battered condition. He told defendant that he had been beaten by Raoul Coleman (Raoul) and Mark Robinson (Mark). Apparently a breaking and entering had taken place and Bert was blamed for selling some of the stolen goods. Defendant then spoke with the larceny victim, Carter, who stated that he only wanted his property back but that Mark and Raoul had blamed Bert for the theft. On July 30, 1977 defendant spoke with Raoul, who mentioned that a fight with Bert had taken place. Raoul denied stealing anything. Defendant again met Raoul and Mark and asked them if they had spoken with Bert to settle the dispute amicably. Raoul answered in the negative and indicated that if there were any more trouble, he would get a gun. Defendant decided to "exercise due caution in circumspection of the matter." On Sunday, July 31, 1977, defendant was with Bert but armed himself with a revolver as a precaution. On their way home from shooting billiards defendant suggested that they stop to see Raoul and settle the matter peacefully. They drove to Raoul's neighborhood and met Raoul's cousin Tillman. Tillman informed them that Raoul was around the corner. Defendant went with Tillman around the corner, but as Tillman suddenly dropped back, defendant saw several silhouettes appearing to be those of Raoul and Mark. Upon observing gun flashes coming from the silhouettes, defendant retreated to the car, opened the door, retrieved his revolver and fired two shots at the ground. The shots were only intended as a warning to let everybody know that he was armed and to enable defendant to get out of the area safely. However, Raoul Coleman died as a result. Defendant then entered the car and Bert drove home. Two bullets were removed from decedent's body, one of them fired from a .38-calibre Rome revolver, the same type obviously possessed by defendant at the time of his arrest.
*445 It is clear that the judge's determination on the motion to suppress was predicated on the evidence that follows, which he deemed credible. The evidence was adduced at the hearing on the motion to suppress. We likewise consider such proofs to be credible and are satisfied that they are sufficient to support that determination.
Armed with a warrant for defendant's arrest, at about 4:30 a.m. on August 1, 1977 police officers Mattis, Laukitis, Pogue and Curry and Union County Prosecutor's Investigator McCormack went to 31 Johnson Avenue, Cranford, defendant's residence. They did not expect to find defendant at home. Rather, they assumed that he would be hiding from Raoul's family. The visit to the house was a routine exercise to make certain that defendant was not at home. Defendant was the only suspect with a known address.
The officers knocked on the door and defendant's wife Dorothy answered. In response to the officers' questions, she told them that defendant was in the bathroom. The police ordered defendant from the bathroom. He complied and was placed under arrest, handcuffed and advised of his "rights." The officers asked Dorothy whether they could search the house but she and defendant refused to allow a search. Defendant demanded to be escorted from the house. Dorothy grew belligerent and joined her husband's demand that the police leave the house immediately. She also indicated to at least one officer that were they to remain in the house, she wanted to leave with her children.
Investigator McCormack, realizing that the police did not have a search warrant, requested that defendant and Dorothy remain in the house until he attempted to speak by radio to an assistant prosecutor to obtain a verbal search warrant. Laukitis and Pogue were ordered not to allow anyone to leave pending the endeavor to obtain the warrant. The police wanted to maintain the status quo until obtaining legal advice on their right to remain and search the house, and the proper procedures to be followed in this respect. McCormack, Curry and Mattis left the *446 house and went to the car to obtain a verbal search warrant. At that time Dorothy was not believed by the police to be under arrest since she was not a suspect in the shooting. She was not permitted, however, to leave her house unless subjecting herself to a search. The police did not want her removing anything from the house until a warrant had been obtained. They reasonably suspected that the gun involved in the killing might be in the house and that she might try to conceal and remove it if permitted to leave. Dorothy was not searched initially because she was dressed in a nightgown under which nothing could have been hidden.
While McCormack, Curry and Mattis were near the patrol car trying to obtain a search warrant, they observed Dorothy leaving the house with a large bundle wrapped in a white bedspread. She was apparently agitated, shouting that she was going to remove her child from the house and that she did not want the child coming into contact with the police. Curry and Mattis came to the conclusion that she was concealing evidence in the bundle, notwithstanding the fact that she carried it as if it contained a child. Mattis asked Pogue, who was inside the house, if the bundle had been searched. He replied in the negative. Mattis believed that the bundle might contain a gun since it was unlikely that someone would take an infant from the home and bring it to another house at that time of the morning. Mattis shouted for Dorothy to stop but she began to run.
McCormack then followed Dorothy in a patrol car, intending to convince her to return to the house voluntarily. The officers did not object to Dorothy leaving her house. They only wanted to keep any packages or bundles from leaving with her.
When McCormack caught up with Dorothy, she was on the porch of a neighbor's property, 51 Johnson Avenue. McCormack left the car and told Dorothy that he would like to talk to her. She then began to cry hysterically. She said that she did not want to talk to the police and demanded that they leave her alone. She told McCormack that they were on someone's property, *447 and he could not touch her. When she began ringing the door bell, McCormack put his hand on her elbow, saying that he just wanted to talk to her and that she should not get excited. McCormack wanted to stop her from ringing the door bell, banging on the door and shouting, since it was very early in the morning, and he did not want her rousing the neighborhood.
After McCormack touched her Dorothy fell to her knees, although holding onto her bundle, and screamed at the top of her lungs. The door opened, revealing two men in the doorway. In their presence Dorothy shouted to McCormack demanding that he unhand her. She bit McCormack on the left wrist. After McCormack placed her under arrest she tried to push her bundle towards the door. Mattis, who had just arrived, observed that the bundle contained an infant about two years old, who was picked up by one of the occupants of 51 Johnson Avenue and brought into the house as McCormack escorted Dorothy down the steps to the patrol car. The bundle remained in the doorway until one of the occupants of the house who was standing there picked it up. After Mattis explained the situation to that person, the latter handed over the bundle. A search of the bundle revealed a .38-calibre Rome revolver, ammunition, a gun-cleaning kit and a holster. Mattis then reported to McCormack, announcing, "we got everything."
A search warrant for the defendant's home and car was eventually obtained from a magistrate upon the affidavit of Mattis and executed on the same day as Dorothy's warrantless search. Among other things, the marijuana was found during the warrant search.
Over the State's objection the trial judge decided that as a matter of substantial justice and fair play defendant had standing to move for suppression of evidence found on his wife. He also held that the warrantless search of defendant's wife Dorothy was not unreasonable and constituted a common sense approach to the matter by the police in the factual context of defendant's arrest for murder while armed, the officers' inability *448 to find the weapon on defendant in a search incident to his arrest, Dorothy's highly suspicious conduct after the arrest warrant had been executed, and the exigent circumstances with which the police were faced. He found that the police had acted lawfully and in no wise displayed insolence in office.
Although no evidence was presented at the hearing concerning the search supported by warrant, defendant's counsel argued that the warrant was obtained from a magistrate who was not informed that Mark Robinson was unable at first positively to identify defendant as the person who shot Raoul Coleman. It was claimed that the evidence found pursuant to the warrant was tainted by the false, or at least incomplete, affidavit submitted to the magistrate. The judge held that there was no reason under State v. Petillo, 61 N.J. 165, 177, 293 A.2d 649 (1972), cert. den. 410 U.S. 945, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973), to go beyond the face of the search warrant and affidavit supporting it and that the magistrate was thus justified in issuing the warrant.

I

The Search Pursuant to the Warrant
Defendant contends that it was error not to suppress the evidence which resulted from the search of his house under the warrant. He argues that in the warrant affidavit the police officer omitted to advise the magistrate that the informant, Mark Robinson, who eventually identified defendant, was unable at first to make a positive identification and that had the magistrate been apprised of this less than iron-clad identification, he might have denied the application.
The affidavit, in addition to stating the facts of Mark's identification of defendant, also recounted the circumstances relating to Dorothy's arrest and the discovery of a .38-calibre revolver in a bundle carried by her. Defendant contends, however, that the warrant, absent the references to Dorothy's allegedly illegal arrest and search, rests upon Mark's identification. *449 There was no testimony adduced at the hearing concerning Mattis' affidavit.
The judge correctly determined that the issue thus presented is governed by State v. Petillo, supra, holding that the truth of the factual assertions contained in the affidavit submitted in support of an application for a search warrant may not be controverted in a subsequent hearing on a motion to suppress the incriminatory evidence seized in the execution of the warrant.
Defendant's contention that Petillo in this respect has been overruled by Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (Franks) is correct. But Franks is inapplicable to a search warrant issued, as here, prior to the date it was decided. State v. Howery, 80 N.J. 563, 568-571 (1979).
Moreover, even if Franks were applicable, defendant has not made the preliminary showing required thereby that the affiant's statements were materially untrue, that such untrue statements were made knowingly and intentionally or recklessly or that the magistrate would not have issued, or could not have found probable cause to issue, the warrant had he known all the facts. The mere conclusory allegation here of perjurious or reckless conduct on the affiant's part is insufficient to cause a hearing to be held on the matter or to cause suppression of the evidence uncovered pursuant to the warrant.
The search and seizure under the warrant were constitutionally valid.

II

The Warrantless Search of Defendant's Wife
Defendant claims that the .38-calibre revolver seized from his wife Dorothy should be suppressed since it was the product of a constitutionally prohibited search and seizure. The contention is without merit.
*450 The search and seizure here are justifiable under three separate exceptions to the general rule that a search and seizure may only be made pursuant to a warrant. See State v. De Lorenzo, 166 N.J. Super. 483, 487-488 (App.Div. 1979). We note that third-party searches for evidence of a crime committed by another are not unconstitutional. See Zurcher v. The Stanford Daily, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).
As Investigator McCormack attempted to persuade Dorothy to return peacefully to her home, she bit him on the hand. She obviously committed an assault on a police officer. See N.J.S.A. 2A:90-4 a. Her arrest, therefore, was entirely legal. Defendant concedes that the search of the bundle involved "a genuine search of the person of Dorothy Meighan," even though the bundle was no longer in her actual possession when it was seized and searched. Such a search and seizure were incidental to her arrest for assaulting the police officer. The bundle and its contents, under the facts here, properly may be considered as a legally permissible search of her person and the area within her immediate control. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); State v. Fariello, 71 N.J. 552, 565-569 (1976); State v. Carter, 54 N.J. 436, 438 (1969), cert. den. 397 U.S. 948, 90 S.Ct. 969, 25 L.Ed.2d 130 (1970); State v. Mark, 46 N.J. 262, 278 (1966).
Probable cause to search and exigent circumstances also justified the search and seizure, irrespective of the arrest. The police had probable cause to believe that Dorothy had on her person or in the bundle she was carrying evidence of the crime committed by defendant. It plainly would not have been practical to obtain a search warrant by reason of the exigent circumstances here involved. The warrantless search and seizure of the bundle and its contents were thus legally unassailable. See State v. Kahlon, 172 N.J. Super. 331 (App.Div. 1980).
The police had probable cause by reason of the arrest warrant to arrest defendant for murder while armed. Since they reasonably *451 did not expect him to be at home when executing the warrant there they had not obtained a search warrant for those premises. The fruitless search of defendant led them to the reasonable belief that the weapon might still be in the house. Although the judge properly drew no adverse inference from the exercise by Dorothy of her right not to consent to a general search of the house, her leaving the home at 5 a.m. carrying a bundle and without informing the police where she was going would lead ordinarily prudent police officers to the belief that she was attempting to spirit away the very incriminating evidence they sought. There was thus probable cause to search the bundle. See State v. Gray, 59 N.J. 563 (1971); State v. Kasabucki, 52 N.J. 110, 116 (1968); State v. Boykins, 50 N.J. 73 (1967).
The reason for such probable cause also generated the exigency. The police obviously wanted to stop defendant's wife from destroying or otherwise disposing of significant and potentially dangerous evidence  a revolver.
Defendant argues that the police were not permitted to conduct this warrantless search since they created the exigency, relying on State v. Williams, 168 N.J. Super. 352, 358 (App.Div. 1979). But the exigencies permitting the search of Dorothy and her effects are distinct from those, if any, created by the police. The police did not attempt to obtain a search warrant since they did not expect to find defendant at home. They did not rely upon this mistaken belief as an exigent circumstance to justify a house search. Rather they attempted to obtain a verbal warrant for that purpose. Only after the request that no parcels or other objects be removed from the house and Dorothy's leaving the house with the bundle was the exigency of Dorothy's possible disposition of the gun created. The police officers thus had probable cause to believe that there was important concealed evidence on Dorothy's person when she left the house. They acted reasonably in seizing it before it was destroyed or otherwise lost. There was no time to obtain a verbal or written search warrant once she was seen by the officers outside of the *452 house. Awaiting such warrant would have impaired seriously the likelihood of seizing the weapon that the police fairly believed was involved in the homicide committed by defendant. See State v. Ransom, 169 N.J. Super. 511, 519-520 (App.Div. 1979); State v. Walton, 159 N.J. Super. 408 (App.Div. 1978); State v. Smith, 129 N.J. Super. 430, 433 (App.Div. 1974), certif. den. 66 N.J. 327 (1974); State v. Galvin, 161 N.J. Super. 524 (Law Div. 1978).
The warrantless search and seizure were justified additionally as being consensual in nature.
Under a mistaken belief that she and the bundle had achieved sanctuary by being on a neighbor's property, Dorothy pushed her bundle within the doorsill of her neighbor's property. The neighbors thus became involuntary bailees of the bundle.
While authority which justifies a third party consent to a search does not rest upon the law of property, evidence sufficient to justify a voluntary warrantless search is not limited to proof that consent was given by the defendant; it may be shown that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. United States v. Matlock, 415 U.S. 164, 171-172, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249-250 (1974). See, also, Frazier v. Cupp, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684, 693-694 (1969); United States v. Walker, 575 F.2d 209 (9 Cir.1978), cert. den. 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 325 (1978); State v. Miller, 159 N.J. Super. 552, 556-557 (App.Div. 1978).
Dorothy pushed the bundle towards her neighbors' doorsill. She could not have had a reasonable expectation that it or its contents would not be exposed to her bailees or others by reason of the bailees' consent. Once the bailees learned that Dorothy might have attempted to hide a weapon inside the bundle, they voluntarily and readily gave it up. The search of the bundle occurred only after its lawful possessor gave permission or consent for the search.
*453 Defendant contends that the initial restriction on Dorothy's freedom constituted an illegal arrest, that the events subsequent to her emergence from the house were a product of this restriction on her liberty and that the eventual search and seizure were tainted by such illegality. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Not so.
While awaiting authorization to search by a verbal warrant, the officers attempted merely to secure the scene to prevent any evidence of this serious crime from being removed or destroyed. That temporary and limited detention of Dorothy was legally proper and not an arrest. See State v. Walton, supra; State v. Bell, 89 N.J. Super. 437 (App.Div. 1965); State v. Galvin, supra. See, also, In re Fingerprinting of M.B., 125 N.J. Super. 115 (App.Div. 1973). We are satisfied, as was the trial judge, that Dorothy was not under arrest until she assaulted McCormack. Her personal freedom was only restricted to the extent that she might attempt to remove or destroy incriminating evidence. She would not have been detained otherwise. She was free to leave the house as long as she did not leave with any such evidence. The police did not inform her that she was under arrest nor did they intend by such restraint to effect an arrest. She obviously then did not understand or believe she was arrested, since she was able to leave the house with the bundle without informing the police. The essentials of an arrest  an intent by the police to effect an arrest and Dorothy's understanding that she was under arrest  are here absent. See People v. Ussery, 24 Ill. App.3d 864, 321 N.E.2d 718, 720 (App.Ct. 1974); State v. Wolfson, 116 N.H. 227, 356 A.2d 692, 694 (Sup.Ct. 1976). Cf. State v. Sheffield, 62 N.J. 441, 447, cert. den. 414 U.S. 876, 94 S.Ct. 83, 38 L.Ed.2d 121 (1973).
We note that the police here acted in complete good faith compliance with the law. After arresting defendant they did not endeavor to conduct a warrantless search of defendant's home when he and his wife would not consent. Instead, three of *454 them endeavored to obtain a verbal search warrant, while the others remained at the premises simply to assure that the weapon used in the killing, if at defendant's home, was not removed therefrom. There is an absolute lack of any showing of insolence in office throughout the entire period since the execution of the arrest warrant. They performed their duty  to obtain an oral warrant to search  and it was only when defendant's wife, in accordance with their reasonable suspicion and belief, through ruse endeavored to secrete and take the weapon that the exigencies of the occasion required them to engage in the conduct resulting in the search and seizure. Such conduct, under the facts of this case, cannot be condemned as a violation of defendant's right to be free of an unreasonable search and seizure. See State v. Galvin, supra. Contrast State v. O'Herron, 153 N.J. Super. 570, 582-583 (App.Div. 1977), cert. den. 439 U.S. 1032, 99 S.Ct. 637, 58 L.Ed.2d 695 (1978).
Thus, defendant's attack on the merits of the warrantless search and seizure of Dorothy's bundle is groundless.
We have concluded, however, that the judge should not have entertained defendant's motion relating to that search and seizure. He erroneously held that defendant had standing to make an application to suppress the evidence resulting therefrom. He relied on Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); State v. Allen, 113 N.J. Super. 245, 249 (App.Div. 1970), and State v. LaDuca, 89 N.J. Super. 159 (App. Div. 1970).
Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), rejected the notion that Jones, supra, supported a "target" or "automatic" theory of standing, i.e., any criminal defendant at whom a search was directed would have standing to contest the legality of the search. The court declined to extend the rule of standing, stating that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted and that a person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third *455 person's premises or property has not had any of his Fourth Amendment rights infringed. Under Rakas v. Illinois, supra, the issue of defendant's right to challenge a search and seizure is to be determined by whether he has a reasonable and legitimate expectation of privacy from governmental intrusion in the place invaded or in the property seized. See State v. Ransom, supra, 169 N.J. Super. at 520; State v. List, 166 N.J. Super. 368, 372 (Law Div. 1979).
In State v. Allen, supra, where defendant was the lessee of the searched apartment, we stated that a defendant may bring a motion to suppress if he has either a proprietary, possessory or participatory interest in the place where the evidence in question was found. In State v. LaDuca, supra, where defendant was the owner of the premises searched, we permitted defendant to object if his interest was in the evidence itself, as well as in the place of search or seizure.
In the present case defendant asserts his right to object even though the search of his wife or her effects was conducted on the property of another. Defendant cannot properly claim a proprietary, possessory or participatory interest in either (a) the gun after it was removed by his wife and while it was on his neighbor's property, or (b) that property. Thus, even under Allen and LaDuca he would have had no standing to object to the claimed infringement of the constitutional rights of another, his wife. Further, he had no reasonable expectation of privacy in his neighbor's home or in what was disclosed by reason of the events occurring there; nor did he have any legitimate expectation of privacy in the bundle carried by his wife to that home.

III

The Sentences
The sentences imposed were to State Prison for concurrent terms of 5 to 10 years for manslaughter and 2 to 5 years for *456 possession of marijuana with a recommendation that the terms be served at the Youth Correctional Institution Complex.
Defendant is stricken with a chronic ailment, sickle-cell anemia, which, if not properly treated, may result in severe infection or death. The trial judge took this fact into account in his sentences, which were within the plea agreement, and in his recommendation that defendant's term be served at the Youth Complex. He also recognized other claimed mitigating circumstances before imposing sentence.
The motion to reconsider the sentences was directed toward release on medical grounds. Since his incarceration at State Prison, defendant had suffered one crisis requiring hospitalization. It was claimed below, and it is now contended, that his condition is not treatable at State Prison. The judge ruled that an insufficient case had been made out for a medical release, distinguishing the situation from the facts involved in State v. Tumminello, 70 N.J. 187 (1976). See also, State v. Sanducci, 167 N.J. Super. 503 (App.Div. 1979), certif. den. 82 N.J. 263 (1979).
Defendant argues that the imposition of any State Prison term, particularly where the sentence is the maximum provided by law, upon one suffering from defendant's ailment is "wholly improper" and that the original sentences and the denial of the motion to modify them were plainly erroneous. He urges that the sentences be vacated and the matter remanded or that we modify them to probationary terms or indeterminate commitments to the Youth Correctional Institution Complex.
We have considered these contentions in the light of the record, including the serious nature of one of the crimes, the plea agreement, the presentence report and the judge's reasons for the sentences and denial of the motion to reconsider them. We are satisfied that the judge's determinations with respect to the sentences did not constitute an abuse of discretion and that *457 there is no reason for our disturbing them. State v. Whitaker, 79 N.J. 503 (1979); State v. Spinks, 66 N.J. 568 (1975).
Affirmed.