THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. JOSEPH KASABUCKI, DEFENDANT-RESPONDENT.

Argued March 18, 1968—Decided June 28, 1968.

114

Mr. Raymond S. Londa, Assistant Prosecutor, argued the
cause for appellant (Mr. Leo Kaplowitz, Union County
Prosecutor, attorney).

The opinion of the court was delivered by

FRANCIS, J. On May 24, 1966, a county judge of Union
County issued a warrant to search defendant Kasabucki's
dwelling at 614 Jefferson Avenue, Elizabeth, New Jersey.
The warrant was based upon (1) an affidavit presented to
the court by Robert C. Ward, a county detective connected
with the prosecutor's office, and (2) oral testimony of Ward
under oath supporting the contents of the affidavit. The
warrant was executed the next day, the search of the premises
being conducted by law enforcement officers. The search re-
vealed substantial physical evidence that bookmaking ac-
tivities were being carried on there. Kasabucki was then
indicted for that offense, N. J. S. 2A:112–3. Thereafter he
moved to suppress the evidence seized upon the ground that
Detective Ward's affidavit was insufficient to satisfy the
probable-cause requirement of the Fourth Amendment of the
United States Constitution and Article I, par. 7 of the New
Jersey Constitution, and therefore the warrant and the re-
sulting search was invalid. A county judge, other than the
one who issued the warrant, heard the motion. Unlike his
colleague, he found the factual statements of the affidavit

inadequate and entered an order suppressing the seized evidence. *R. R.* 3:2A–6. The Appellate Division granted the State leave to appeal, and after hearing argument, affirmed. 96 *N. J. Super.* 173 (1967). On the State's application we certified the matter. 50 *N. J.* 288 (1967).

▮ As we have noted on a number of occasions, the Federal and State Constitutions do not bar all searches and seizures. They bar only those that are "unreasonable."[1] *State v. McKnight,* 52 *N. J.* 35, filed June 3, 1968; *State v. Davis,* 50 *N. J.* 16, 22 (1967); *State v. Mark,* 46 *N. J.* 262, 275 (1966).[2] A basic purpose of the framers of this important right was to protect the citizen against unwarranted invasion of his home by police officers. The intention was to impose an obligation on police officers, except in unusual situations which need not be discussed here, not to search a person's home until they have presented their estimate of probable cause for the search to the detached scrutiny of a neutral judge, and obtained his formal authorization to do so. *Katz v. United States,* 389 *U. S.* 347, 88 *S. Ct.* 507, 19 *L. Ed. 2d* 576, 585 (1967); *United States v. Ventresca,* 380 *U. S.* 102, 105–106, 85 *S. Ct.* 741, 13 *L. Ed. 2d* 684, 687 (1965).

▮▮ When the police officer does not rely on his own evaluation of facts, but submits them to the independent judgment of a judicial officer for a determination as to whether they add up to probable cause, a search pursuant to a warrant issued by a judge cannot be equated with "insolence in office" or abuse of the officer's police power, nor can it be said reasonably that the citizen's Fourth Amend-

---

[1] Both Constitutions contain virtually identical language:

"The right of the people to be secure in their persons, houses, papers and effects against *unreasonable* searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation * * *." (Emphasis added).

[2] Since the preparation of this opinion the United States Supreme Court has reaffirmed this principle. *Terry v. State of Ohio,* 392 *U. S.* 1, 88 *S. Ct.* 1868, 20 *L. Ed. 2d* 889 (1968); *Sibron v. State of New York,* 392 *U. S.* 40, 88 *S. Ct.* 1889, 20 *L. Ed. 2d* 917 (1968).

ment security rests only in the discretion of the police. *Johnson v. United States,* 333 *U. S.* 10, 13–14, 68 *S. Ct.* 367, 92 *L. Ed.* 436, 440 (1948). *Eleuteri v. Richman,* 26 *N. J.* 506, 514 (1958). Thus when the adequacy of the facts offered to show probable cause is challenged after a search made pursuant to a warrant, and their adequacy appears to be marginal, the doubt should ordinarily be resolved by sustaining the search. *United States v. Ventresca, supra,* 380 *U. S.,* at *p.* 109, 85 *S. Ct.* 741, 13 *L. Ed. 2d,* at *p.* 689; *State v. Mark, supra,* 46 *N. J.,* at *p.* 273. That is because the warrant provides clear evidence of the legitimacy of the officer's purpose. The decisions bespeak the preference accorded a search authorized after the facts and inferences therefrom have been subjected to neutral judicial consideration and found to constitute probable cause for it.

 Probable cause is a flexible, nontechnical concept. It includes a conscious balancing of the governmental need for enforcement of the criminal law against the citizens' constitutionally protected right of privacy. It must be regarded as representing an effort to accommodate those often competing interests so as to serve them both in a practical fashion without unduly hampering the one or unreasonably impairing the significant content of the other. *State v. Davis, supra,* 50 *N. J.,* at *p.* 24. Thus, although incapable of precise definition, the term has been construed to signify less evidence than would be required to establish guilt of the crime for which the warrant is sought. *Brinegar v. United States,* 338 *U. S.* 160, 173–176, 69 *S. Ct.* 1302, 93 *L. Ed.* 1879, 1889–1890 (1949). It means something more than "raw unsupported suspicion." It is a suspicion of guilt that is well-grounded; a reasonable basis for a belief that a crime has been or is being committed. *State v. Davis, supra,* 50 *N. J.,* at *pp.* 23–24; *State v. Burnett,* 42 *N. J.* 377, 386 (1964). A finding of probable cause may rest upon evidence not competent at a criminal trial. *Jones v. United States,* 362 *U. S.* 257, 270, 80 *S. Ct.* 725, 4 *L. Ed. 2d* 697, 707 (1960); *Draper v. United States,* 358 *U. S.* 307, 311–

312, 79 *S. Ct.* 329, 3 *L. Ed. 2d* 327, 331 (1959). Hearsay is an adequate basis for the finding and the issuance of a warrant, so long as there is something coupled with the hearsay to give it reasonable credit, something which gives it the appearance of trustworthiness. *Jones v. United States, supra,* 362 *U. S.,* at *p.* 272, 80 *S. Ct.* 725, 4 *L. Ed. 2d* at 709; *State v. Burnett, supra,* 42 *N. J.,* at *p.* 387; *State v. Burrachio,* 39 *N. J.* 272, 275 (1963).

When a police officer seeking a search warrant presents the basis therefor in affidavit form to a judge for evaluation on the issue of probable cause, the judge's approach must be a practical and realistic one. The officer's statements must be looked at in a common sense way without a grudging or negative attitude. There must be an awareness that few policemen have legal training and that the material submitted to demonstrate probable cause may not be described with the technical nicety one would expect of a member of the bar. Moreover, the judge should take into account the specialized experience and work-a-day knowledge of policemen. *State v. Contursi,* 44 *N. J.* 422, 431 (1965). The facts asserted must be tested by the practical considerations of everyday life on which reasonably prudent and experienced police officers act. *Brinegar v. United States, supra,* 338 *U. S.,* at *p.* 175, 69 *S. Ct.* 1302, 93 *L. Ed.,* at *p.* 1890. Once the judge has made a finding of probable cause on the proof submitted and issued the search warrant, a reviewing court, especially a trial court, should pay substantial deference to his determination. In fact, another trial judge of equal jurisdiction should regard as binding the decision of his brother that probable cause had been sufficiently shown to support a warrant, unless there was clearly no justification for that conclusion. *State v. Tanzola,* 83 *N. J. Super.* 40, 43 (*App. Div.* 1964).

The above observations make plain that no mathematical formula exists for application either by a trial or appellate court in deciding whether a search warrant was supported by probable cause. Each case depends upon a sensi-

tive appraisal of the circumstances shown to the issuing judge. Consequently we turn to an examination. of the affidavit submitted in support of the warrant in this case.

 Detective Ward's affidavit reveals that on May 16, 1966 the Union County Prosecutor received a copy of a letter from the First Deputy Commissioner of the New York City Police Department to the Chief of Police of the City of Elizabeth, N. J. (copy of which was attached to the affidavit). It advised that

"Confidential information has been obtained by this Department that telephone Area Code 201-1351-2904 is being used for illegal gambling purposes (Bookmaking-horses). The phone is listed to:
Joseph Kasabucki
614 Jefferson Ave.
Elizabeth, N. J.
We would appreciate hearing from you relative to any results obtained from this information.
Assuring you of our continued cooperation in matters of mutual interest * * *."

Ward further deposed that investigation had ascertained that the telephone number was in fact listed to Kasabucki. The address in the letter was correct. It was a one-family house and, according to telephone company records, two hand-set telephones bearing the number 351-2904 had been installed there. A few days later Ward personally called the number and an unidentified male voice answered. A verbatim account of the conversation was reported to his superior officer. It follows: ("W" refers to Ward and "Voice" refers to the unidentified male) :

"W : Hey, Cace [or 'Kas'], This is Bob. I want a 2/4 reverse in the 5th and 6th at Aqueduct.
Voice : Bob who?
W : Bob Wilson.
Voice : I don't know no Bob Wilson. Who told you to call me?
W : Willie, little Willie.
Voice : Where do you know him from?
W : From the place. You know, the saloon.
Voice : What place?

W: Garby's
Voice: Well, put him on then.
W: I'm not there now.
Voice: How come he told you to call me?
W: I saw him at lunch. I told him I had a good one.
Voice: What did you say your name was again?
W: Bob Wilson. Do you want to take this?
Voice: No. I don't know you.
W: Well, I got to call a guy in Newark then. I wanted to get connected locally. You don't want it then?
Voice: No. I don't know you."

The affidavit concluded:

"As a result of my experience in the field of gambling law enforcement ['some years' of investigating gambling laws' violations] this conversation indicates to me that the person who answered the telephone is accepting bets on horse races but did not accept the bet offered him by me because I am unknown to him and * * * was unable to offer him the proper credentials, *i. e.*, code name or pass word." (Insertion ours based upon earlier paragraph in Ward's affidavit.)

As noted above, the county judge to whom the application for a warrant to search the described Kasabucki premises was made not only examined the affidavit, but also took Ward's oral supporting testimony. The testimony added no new facts. Pursuant to a finding that probable cause for a search had been shown, the warrant was issued. The search resulted in seizure of three sheets of paper with horse race bets on them, $277 from the person of Kasabucki, and $3800 from a bedroom vanity.

The bookmaking indictment and Kasabucki's motion to suppress followed. As we have said, the county judge who heard the motion disagreed with the issuing judge as to the validity of the warrant. He regarded Ward's interpretation of the telephone conversation as "wishful thinking." He held that the finding of probable cause was unsupported by anything but conclusory statements without adequate supporting facts, and by hearsay evidence to which no probative force or credit could be given. Consequently he invalidated

the warrant and suppressed the seized evidence. The Appellate Division agreed, but we cannot.

We have already indicated that in reviewing the legal propriety of a search warrant, substantial deference should be paid to the issuing court's finding of probable cause. The affidavits presented to the court on the application should not be examined with a hypertechnical eye. The approach must be a practical and common sense one. It must be engaged in with a consciousness that bookmaking operations are carried on cautiously, furtively and deceptively, and by as many camouflages as human ingenuity can devise. *State v. Contursi, supra,* 44 *N. J.,* at *p.* 431. The consideration cannot be a grudging one. Such an attitude would give no weight to the good faith of the police officer in seeking judicial sanction for the search. Moreover, that attitude would probably result in failure to take into account a significant factor, *i. e.,* the officer's experience with bookmaking activities and the factual indications of them.

In our judgment it was reasonable for the prosecutor, Detective Ward and the trial judge to assume that the letter from a superior officer of a police department in an adjoining state was not an idle gesture. On the contrary, they could fairly feel that the letter had a ring of authenticity, and that the "confidential information" about the bookmaking operation was substantial and reliable. Further credibility arose from the fact that copies had been sent to the Police Chief of the City of Elizabeth and to the Attorney General of New Jersey. Its conclusion also added to the appearance of verity: "Assuring you of our continued cooperation in matters of mutual interest * * *." Moreover, the letter was sufficiently prestigious to provide a measure of corroboration for the facts and opinion contained in Ward's affidavit, and reciprocally, Ward's facts and opinion gave substantial credit to the hearsay information in the letter.

It is conceivable that on the record made the issuing judge might not have been convinced that probable cause had been shown. But obviously he accepted as true the facts

Ward presented. He believed also from the affidavit and the testimony relating to Ward's expertise in gambling cases that the telephone conversation with the unknown person at Kasabucki's home in conjunction with the Police Commissioner's letter created a well-grounded suspicion that bookmaking was going on at that address. We cannot say that such conclusion lacked rational basis.

The telephone conversation detailed above should not be dismissed as of no significance. Ward's introductory statement to the voice on Kasabucki's telephone that he wanted a 2/4 reverse in the 5th and 6th at Aqueduct, if made to a stranger to horse race betting, would probably have produced an ejaculation of surprise or mystification. Instead the voice merely sought identification of the caller. This was followed by an inquiry seeking identification of the person who had suggested that Wilson (Ward) call Kasabucki. It is not unreasonable to infer that the voice wanted to know who told the caller to telephone for the purpose of placing a horse race bet. When Ward referred to "Willie, Little Willie," again there was no rejection of the named person or of the caller. Instead, further information was solicited as to where the caller knew little Willie from. On being advised Willie was known from "Garby's" saloon, which apparently was familiar to the voice, again there was no cut-off. It is inferable that the voice was still thinking of the "2/4 reverse" bet, so the sparring and checking continued and the voice suggested that Willie be put on the phone. When this did not prove to be possible, the voice, still checking, tried to find out how Willie, whose name apparently was not a strange one to him, happened to tell the caller to telephone Kasabucki. When Ward said he saw Willie at lunch and told Willie he "had a good one," again the inference is strong that the voice knew the reference was to a tip on a horse race. There was no exhibition of surprise or lack of understanding, simply a request to repeat the caller's name. Finally, when the name was repeated with an inquiry as to whether the voice wanted "it," (obviously meaning the bet), the voice

said twice, "No, I don't know you." The tenor of the conversation reasonably justifies an inference that the probing by the voice did not come from a lack of understanding that Ward wanted to place a horse bet with him. Rather it came from caution born of awareness of the criminal nature of the proposed transaction, and a consequent desire to be sure that the caller's alleged sponsor had provided him with sufficient accreditation and identification as a bettor with whom it would be safe to deal. Only when the caution was not satisfied was the bet rejected. In doing so the voice did not say he did not know what the caller was talking about, or that he was not in the business of bookmaking, he simply said in effect, "I will not take your bet because I do not know you."

As we have already noted, the conversation indicated to the experienced detective that bookmaking was going on at Kasabucki's home, and that the bet was rejected because the voice did not receive the "code name or password" or sufficient identification of the caller. In our judgment all the circumstances considered together were adequate to establish a reasonable basis for believing that bookmaking was being carried on at Kasabucki's premises. In their totality they reached a higher plane than speculation or conjecture or raw unsupported suspicion. The warrant-issuing judge's conclusion that the facts supplied to him gave rise to a well-grounded suspicion that bookmaking existed at the designated address is a sensible and realistic one. A contrary view would sanction an undue competitive restriction on law enforcement activities in this furtively pursued area of criminality.

The tendency to be hypertechnical in evaluating the facts accepted by the issuing court as sufficient to show probable cause for a search warrant ought to be put aside. It must be remembered that the officer making the search was conscious of the citizen's Fourth Amendment security, and that out of concern for it he sought and obtained judicial approval of the propriety of his proposed search. Realistically, then, the warrant-supported search ought to be regarded

as cloaked with an aura of *prima facie* legality. A reviewing court should not apply a proof-of-guilt test to affidavits or testimony designed only to reveal probable cause. The *quantum* of evidence required to show probable cause for a search warrant is less than that necessary for condemnation or conviction for the crime allegedly involved. *Draper v. United States, supra,* 358 *U. S.,* at *pp.* 311–312, 79 *S. Ct.* 329; *United States v. Lewis,* 392 *F. 2d* 377 (*2d Cir.* 1968). Only by utilizing such a wholesome approach can a reviewing court give fair leeway to police officers' honest efforts to administer the criminal law. *State v. Davis, supra,* 50 *N. J.,* at *pp.* 22–24; *State v. Zuzulock,* 39 *N. J.* 276 (1963).

We hold that the total factual complex submitted to the county judge generated adequately a reasonable belief that bookmaking was being conducted on defendant's premises, and that such belief justified issuance of the search warrant. Accordingly the judgment of the Appellate Division is reversed and the cause is remanded for trial of the indictment.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7

*For affirmance*—None.