NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0070-15T3

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

ALFREDO LOPEZ, a/k/a BUGSY,

 Defendant-Appellant.
_________________________________

 Submitted May 3, 2017 – Decided June 29, 2017

 Before Judges Accurso and Lisa.

 On appeal from Superior Court of New Jersey,
 Law Division, Bergen County, Indictment No.
 13-10-01370.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Stephen W. Kirsch, Assistant
 Deputy Public Defender, of counsel and on the
 brief).

 Gurbir S. Grewal, Bergen County Prosecutor,
 attorney for respondent (Catherine A. Foddai,
 Senior Assistant Prosecutor, of counsel and
 on the brief).

PER CURIAM
 After his motion to suppress evidence seized as a result of

a search conducted pursuant to, or as a consequence of, a

communications data warrant authorizing the installation and use

of a Global Positioning System (GPS) device on his automobile,

defendant pled guilty to first-degree possession with intent to

distribute heroin, N.J.S.A. 2C:35-5a(1) and 5b(1). He was

sentenced in accordance with the recommendation in his plea

agreement to ten years imprisonment with a five-year parole

disqualifier, to be served consecutively to a sentence he was then

serving. On appeal, defendant argues:

 POINT I

 DEFENDANT'S MOTION TO SUPPRESS THE ITEMS
 SEIZED SHOULD HAVE BEEN GRANTED; THERE WAS NOT
 PROBABLE CAUSE FOR THE ISSUANCE OF THE SEARCH
 WARRANT.

 POINT II

 THE MATTER SHOULD BE REMANDED FOR
 RECONSIDERATION OF THE SENTENCE.

We reject these arguments and affirm.

 The warrant authorizing the GPS device was issued on February

19, 2013. It was supported by the affidavit of that date by New

Jersey State Trooper Richard Pogorzelski, who was assigned to the

Violent and Organized Crime Control North Bureau, Drug Trafficking

North Unit (DTNU), Strategic Targeting Squad. The judge to whom

the affidavit was presented was limited to the information

 2 A-0070-15T3
contained within the four corners of the affidavit. State v.

Wilson, 178 N.J. 7, 14 (2003). Accordingly, we will set forth a

summary of those facts, to which both the Law Division judge and

we are limited in determining the propriety of the warrant.

 Pogorzelski had extensive training and experience in drug

identification and investigative procedures, including with

respect to illicit distribution of narcotics, gang investigations,

and the collection of gang-related intelligence. He possessed a

Bachelor of Arts degree in criminal justice, and had been assigned

to the DTNU for eight years at the time of making the affidavit.

He had participated in more than one hundred narcotics and criminal

investigations. He had arrested and interviewed individuals

involved with violating drug laws as well as members and associates

of street gangs. He had conducted surveillance on individuals and

groups who are members of criminal organizations. Through these

activities and contacts with other law enforcement agencies

enforcing gang and narcotics violations, he had become familiar

with methods and patterns of activities associated with street

gangs and the distribution of illegal drugs.

 In January 2012, the DTNU received information from the Drug

Enforcement Agency (DEA) that defendant was involved in the

distribution of heroin in and around northern New Jersey and New

York. The information provided defendant's date of birth and

 3 A-0070-15T3
described the car he was using, a gray Jaguar XJ, to transport and

store heroin and the proceeds derived from sales.

 A check of motor vehicle records revealed that defendant also

owned a 2007 Cadillac Escalade. It was later learned that this

vehicle received a parking ticket in the area of Charles Street

in Garfield on October 10, 2012.

 A subsequent criminal history check revealed that on March

3, 2012, defendant had been arrested in Paramus for eluding the

police. During the pursuit, he allegedly threw approximately 2500

decks of heroin out of the motor vehicle before being apprehended.

He was under indictment in Bergen County for those charges at the

time of Pogorzelski's affidavit.

 The criminal history check also revealed that defendant had

indictable convictions for drug distribution crimes committed in

1998, 2003 and 2005, resulting respectively in State Prison

sentences of eight, four, and five years. He also had other

criminal convictions.

 An inquiry into employment records revealed that defendant

was unemployed at the time of Pogorzelski's affidavit. His last

known employment was in 2009.

 Physical surveillance of defendant by the DTNU began on

January 9, 2013. The affidavit described observations made on

January 9, 21 and 25, and February 12, 2013.

 4 A-0070-15T3
 On January 9, 2013, defendant's Jaguar was observed parked

in front of 217 MacArthur Avenue in Garfield. An individual

matching defendant's description walked toward it, entered it, and

drove away from the area. The car had a temporary registration

tag, a look-up of which revealed that it had been issued to

defendant, with an address of 22 Stegman Terrace in Jersey City.

Surveillance was conducted at that location, but neither the Jaguar

nor defendant were ever seen there.

 On January 21, 2013, the Jaguar was again seen at 217

MacArthur Avenue. Defendant was observed walking around the block,

repeatedly looking from side-to-side, scanning the area.

Defendant did not approach the Jaguar, but continued looking side-

to-side, as if checking for law enforcement presence.

 Based on his training and experience, Pogorzelski stated that

the use of fictitious addresses is a typical practice utilized by

large-scale drug dealers to thwart detection of their actual

whereabouts. Likewise, his training and experience taught him

that "squaring the block and looking inside parked cars are

counter-surveillance maneuvers used by individuals to detect the

presence of law enforcement."

 On January 25, 2013, the Jaguar was parked in front of 217

MacArthur Avenue. It contained a temporary registration issued

to defendant, but this was different than the one previously

 5 A-0070-15T3
observed. Based on his training and experience, Pogorzelski was

aware that "criminals often change the license plates on their

vehicles in order to hide their true identity or to avoid detection

of law enforcement." Further, a second temporary registration is

not typically issued for a vehicle. The temporary registration

initially issued is typically replaced by a permanent license

plate.

 Another observation was also made on January 25, 2013. A

black Dodge Challenger bearing a Georgia temporary registration

was parked in front of 217 MacArthur Avenue. An individual later

identified as Brandon Pinzon exited the vehicle and walked up to

the front door while talking on his cell phone, and then returned

to the Dodge Challenger and sat in the driver's seat for some

time. A criminal record check revealed that Pinzon had been

arrested for distribution of heroin, cocaine and marijuana, and

possession of a firearm during the commission of a crime.

 After about an hour, Pinzon travelled slowly around the block,

a maneuver Pogorzelski described as another counter-surveillance

technique. Defendant then exited 217 MacArthur Avenue and got

into the Challenger with Pinzon. After traveling approximately a

half of a block, they parked for a short time and then returned

to where defendant had entered the vehicle. Defendant got out of

the Dodge Challenger, entered his Jaguar, and drove away.

 6 A-0070-15T3
Pogorzelski stated that, based on his training and experience, he

believed this short meeting was indicative of a narcotics

transaction or narcotics business meeting, having taken place away

from 217 MacArthur Avenue because "many times drug dealers conduct

their illicit business inside vehicles in order to remain hidden

from view and away from their homes or stash locations."

 On February 12, 2013, defendant came out of 217 MacArthur

Avenue and walked toward his Jaguar, the whole time talking on his

cell phone and scanning the area side-to-side. He got into the

Jaguar and drove off. He was followed and observed to make erratic

lane changes and turns without signaling. He traveled to the

Paterson Stamp Store in Clifton. He got out of the Jaguar and

entered the store for about five minutes. The store is known to

members of the DTNU, based on debriefing several defendants and

confidential sources, as a place used by narcotics traffickers,

specifically heroin mill managers, to purchase stamps for their

production facilities. These are used to affix their brand name

to the drugs they sell.

 Defendant then drove from the stamp store to Hackensack. He

was observed squaring blocks, driving past the same locations,

repeatedly passing the same streets, looking into vehicles as they

passed him, and, in one instance, activating his left-turn signal

but making a right turn. He eventually parked the Jaguar and

 7 A-0070-15T3
walked into a building. These maneuvers appeared to Pogorzelski

to be further counter-surveillance techniques utilized by

defendant to see if law enforcement was following him.

 A utility company record check, with subpoenaed records,

revealed that defendant was not among the names and addresses of

any subscribers or customers at 217 MacArthur Avenue. The building

contained four apartments but defendant was not listed as a

subscriber or customer in any of them. Again, based upon his

training and experience, Pogorzelski knew "that members of drug

trafficking organizations utilize fictitious or third party names

when renting apartments in an attempt to isolate themselves from

prosecution or detection by law enforcement."

 Pogorzelski expressed the need for the GPS device in order

to continue this investigation. Because of the observed counter-

surveillance techniques defendant was utilizing, it was his belief

that "continued physical surveillance increases the risk of

compromising the integrity and effectiveness of this

investigation" because their cover would eventually be

compromised, "thereby endangering the chances of ascertaining the

full scope of the illegal operation." Accordingly, "the requested

device is a crucial aid to physical surveillance that will permit

the investigation to remain covert and for the safety of the

officers involved in this surveillance." Further, the device will

 8 A-0070-15T3
permit monitoring of the location of the Jaguar, "which there is

probable cause to believe will be the transport vehicle for the

narcotics." Additionally, the device would help to establish a

pattern for defendant's movements and contacts.

 The affidavit also contained the following paragraphs:

 17. Based upon my training and
 experience, and the information developed thus
 far in this investigation, I know that
 transactions and meetings related to the
 transportation and distribution of controlled
 dangerous substances occur at diverse hours
 of the day and night on a seven day-a-week
 basis. I also know, based upon my training
 and experience, that persons involved in
 illegal drug distribution activities often
 vary the patterns of operation to avoid
 detection. I further believe that the
 captioned gray Jaguar XJ, will be used in the
 furtherance of the commission of the specified
 crimes on an unpredictable basis and at all
 hours of the day and night, seven days-a-week.

 18. I believe that the execution of the
 Communications Data Warrant and Search Warrant
 described in Paragraph 2, supra, will reveal
 the location of the captioned gray Jaguar XJ
 as it travels in and around New Jersey, as
 well as to neighboring jurisdictions. By
 tracking the captioned vehicle, I will be able
 to determine the time and route of the
 captioned vehicle and the locations to which
 it is driven. I will be able to make
 arrangements to place the said vehicle under
 physical surveillance when feasible and safe
 to do so. The combined use of the monitoring
 device and physical surveillance will assist
 in identifying other individuals involved in,
 and significant locations used by this
 organization for the processing, transfer, and
 storage of illicit narcotics, and the proceeds

 9 A-0070-15T3
 generated therefrom. Determining the
 identities of all the individuals involved in
 this operation, as well as key locations used,
 will assist in defining the overall scope of
 the operation and in gathering sufficient
 evidence to successfully prosecute its
 members.

 The affidavit was presented to Judge Edward A. Jerejian, who

issued the warrant. By its terms, the warrant expressed the

judge's findings that

 the facts presented in said application show
 probable cause for believing that issuance of
 an Order to install and monitor a tracking
 device . . . upon the subject automobile will
 lead to the discovery of evidence of [drug]
 crimes . . . and that said installation and
 monitoring will tend to identify individuals
 engaged in violations of the aforementioned
 offenses.

 Defendant pled guilty on January 13, 2015, to possession with

intent to distribute heroin. In the plea colloquy he acknowledged

that on March 21, 2013, he possessed, along with others, five

ounces or more of heroin with the purpose to give or sell it to

others. The pre-sentence report reveals that the incident in

which the drugs were seized and the arrests were made involved

defendant who arrived at the location in the gray Jaguar. The

matters contained in this paragraph, of course, are not contained

within the four corners of the search warrant affidavit. We merely

state them for purposes of completeness.

 10 A-0070-15T3
 Defendant moved to suppress the evidence seized as a result

of the search warrant authorizing installation of the GPS device

on his Jaguar. The motion came before Judge Liliana S. DeAvila-

Silebi. No testimony was presented. The sole issue was whether

the search warrant affidavit provided the requisite probable cause

to authorize issuance of the warrant.

 After hearing oral argument, Judge DeAvila-Silebi issued a

comprehensive oral opinion. She recognized the deference that

should be accorded to the issuing judge's probable cause

assessment, and she set forth the proper standards required to

establish probable cause. She recognized that the information in

the affidavit must be considered under a totality of the

circumstances test. Recognizing Pogorzelski's extensive training

and experience, she observed that it is necessary "to take into

account what is the trooper observing or what is the police officer

reporting based on his training and experience because to a

layperson certain information may be just innocent behavior but

to a trooper with specific training and experience may see it

differently."

 The judge then went through the particulars set forth in

Pogorzelski's affidavit. She noted that each incident could be

viewed as innocent behavior, especially by a layperson, but even

by a law enforcement officer. However, in the aggregate, she was

 11 A-0070-15T3
persuaded that based on all of the information provided, including

defendant's criminal history and the counter-surveillance

maneuvers recognized by members of the DTNU, a pattern of conduct

emerged. When viewed through the perspective of a law enforcement

officer well trained and experienced in investigating the

behaviors of individuals involved in high-level drug distribution

enterprises, that pattern of conduct established probable cause

that defendant was engaged in drug distribution activity and was

utilizing his Jaguar in those activities. She therefore denied

defendant's suppression motion. She said:

 So for that reason based on everything that
 I've said and the totality of the
 circumstances and all the specific facts that
 I've brought out out of the affidavit, and
 you'll notice I didn't bring out all the facts
 because the other facts are not important in
 my evaluation of the standard. Those facts
 alone that I brought out are sufficient enough
 to establish a suspicion of criminal activity
 to warrant the GPS installation.

 It's a well founded suspicion or belief
 of guilt. And also traditional surveillance
 methods would not have been effective in this
 case based on the totality of everything that
 happened in the affidavit, how it was
 difficult for them to follow them for long
 periods of time because of the fact that in
 fact they were doing a lot of squaring of the
 blocks.

 So for that reason the GPS was valid.
 The search warrant was valid. It's not going
 to be suppressed, any of the evidence.

 12 A-0070-15T3
 Under the Constitutions of the United States and New Jersey,

individuals are protected from unreasonable searches and seizures,

and no warrant shall issue except upon probable cause. U.S. Const.

amend. IV; N.J. Const. art. I, ¶ 7. Unless a search falls within

one of the recognized exceptions to the warrant requirement, the

police must first obtain a warrant from a neutral judicial officer

as a prerequisite to a search. State v. Sullivan, 169 N.J. 204,

210 (2001). Before issuing a warrant, the judge must be satisfied

that probable cause exists to support the belief that a crime has

been or is being committed at a specific location, or that evidence

of a crime will be found at the place to be searched. Ibid. The

installation of a GPS device on a vehicle is a search within this

context. United States v. Jones, 565 U.S. 400, 404-12, 132 S. Ct.

945, 949-53, 181 L. Ed. 2d 911, 917-23 (2012).

 The concept of probable cause "eludes precise definition."

Sullivan, supra, 169 N.J. at 210 (quoting Wildoner v. Borough of

Ramsey, 162 N.J. 375, 389 (2000)). Courts generally accept it to

mean "less than legal evidence necessary to convict though more

than mere naked suspicion." Id. at 210-11 (quoting State v. Mark,

46 N.J. 262, 271 (1966)). Probable cause is "consistently

characterized . . . as a common-sense, practical standard" for

testing a warrant's validity, State v. Novembrino, 105 N.J. 95,

120 (1987), which is met when police have a well grounded suspicion

 13 A-0070-15T3
that a crime is being committed. Sullivan, supra, 169 N.J. at

211.

 In identifying the competing policy concerns behind the

probable cause requirement, our Supreme Court has said:

 Probable cause is a flexible,
 nontechnical concept. It includes a conscious
 balancing of the governmental need for
 enforcement of the criminal law against the
 citizens' constitutionality protected right
 of privacy. It must be regarded as
 representing an effort to accommodate those
 often competing interests so as to serve them
 both in a practical fashion without unduly
 hampering the one or unreasonably impairing
 the significant content of the other.

 [State v. Kasabucki, 52 N.J. 110, 116 (1968).]

The United States Supreme Court similarly described probable cause

as a "practical, non-technical conception." Illinois v. Gates,

462 U.S. 213, 231, 103 S. Ct. 2317, 2328, 76 L. Ed. 2d 527, 544

(1983). Probable cause requires more than mere suspicion; it

requires a showing of a "fair probability" that criminal activity

is taking place. State v. Demeter, 124 N.J. 374, 380-81 (1991).

 A probable cause determination must be based on the totality

of the circumstances and requires consideration of probabilities.

State v. Jones, 179 N.J. 377, 389. The totality of the

circumstances is, by definition, very fact sensitive. A

qualitative analysis is required to be applied to the unique facts

and circumstances in any given case. State v. Keyes, 184 N.J.

 14 A-0070-15T3
541, 556 (2005). The analysis comes down to a "practical, common-

sense decision." Jones, supra, 179 N.J. at 390. Whether probable

cause exists "involves no more than a value judgment upon a factual

complex rather than an evident application of a precise rule of

law, and indeed a value judgment which inevitably reflects the

seasoning and experience of the one who judges." Schneider v.

Simonini, 163 N.J. 336, 362 (2000), cert. denied, 531 U.S. 1146,

121 S. Ct. 1083, 148 L. Ed. 2d 959 (2001) (quoting State v.

Funicello, 60 N.J. 60, 72-73 (Weintraub, C.J., concurring), cert.

denied, 408 U.S. 942, 92 S. Ct. 2849, 33 L. Ed. 2d 766 (1972)).

 For these reasons, a reviewing judge should pay "substantial

deference" to the discretionary determination of the judge who

issued the warrant. Sullivan, supra, 169 N.J. at 211; Kasabucki,

supra, 52 N.J. at 117. Review of a warrant's efficacy "is guided

by the flexible nature of probable cause and by the deference

shown to issuing courts that apply that doctrine." Sullivan,

supra, 169 N.J. at 217. Warrant applications "should be read

sensibly rather than hypercritically and should be deemed legally

sufficient so long as they contain[] factual assertions which

would lead a prudent [person] to believe that a crime [has] been

committed and that evidence . . . of the crime [is] at the place

sought to be searched." Ibid. (quoting State v. Laws, 50 N.J.

 15 A-0070-15T3
159, 173 (1967) (alteration in original), cert. denied, 393 U.S.

971, 89 S. Ct. 408, 21 L. Ed. 2d 384 (1968)).

 If the information in the affidavit could have reasonably led

the issuing judge to find probable cause, that judge's

determination should not be second guessed upon review. When the

adequacy of the facts supporting probable cause in a search warrant

affidavit is challenged, "and their adequacy appears to be

marginal, the doubt should ordinarily be resolved by sustaining

the search." Jones, supra, 179 N.J. at 388-89 (quoting Kasabucki,

supra, 52 N.J. at 116). It is therefore well settled that a search

executed pursuant to a warrant is presumed valid, and the defendant

bears the burden of proving lack of probable cause in the warrant

application. Sullivan, supra, 169 N.J. at 211.

 For the purposes of this court's appellate review, a Law

Division judge's review of whether a search warrant was supported

by adequate probable cause is a question of law. The trial court's

interpretation of the law is not entitled to any special deference,

and our review is de novo. Manalapan Realty, L.P. v. Twp. Comm.

of Manalapan, 140 N.J. 366, 378 (1995).

 Applying these principles, upon our de novo review, we concur

with Judge DeAvila-Silebi's conclusion that the issuing judge did

not err in finding that Pogorzelski's affidavit provided

sufficient facts to establish probable cause that defendant was

 16 A-0070-15T3
engaged in ongoing drug distribution activity. We reject

defendant's argument that Pogorzelski set forth nothing more than

a series of hunches which, even if considered in the aggregate,

did not establish a reasonable probability of criminal activity.

We agree, as did Judge DeAvila-Silebi, that viewed in isolation,

each of the observed incidents would not support a probable cause

finding. Likewise, the information received from the DEA, although

reliable and sufficiently detailed to lend credibility to it, was

a year old when physical surveillance of defendant began. However,

it did provide background information which, along with

defendant's prior criminal history, including three separate

indictable convictions for drug distribution offenses, was

properly considered. It was also appropriate for members of the

DTNU to take into account defendant's arrest on March 3, 2012, for

a drug related offense, in which he allegedly possessed a very

large quantity of heroin which was packaged for distribution.

 The counter-surveillance techniques described by Pogorzelski

might not be obvious to laypersons, and might not be significant

in a single isolated incident. However, through the lens of

training and experience, the continuous utilization of these

techniques demonstrated to law enforcement officers possessing

expertise in investigating high-level drug distribution

organizations a substantial probability that drug distribution

 17 A-0070-15T3
activity was being conducted. Defendant's suppression motion was

properly denied.

 Defendant's excessive sentencing argument requires little

discussion. Pursuant to the plea agreement, defendant was

sentenced for this first-degree crime to a base term at the bottom

of the first-degree range, namely ten years, with a parole

disqualifier of five years. Also, as provided in the plea

agreement, the sentence was ordered to be served consecutively to

the sentence defendant was then serving for a drug conviction

arising out of the March 3, 2012 arrest.

 Judge James J. Guida imposed the sentence. He found the

applicability of aggravating factors (3) the risk that defendant

will commit another offense, (6) the extent and seriousness of

defendant's prior criminal record, and (9) the need for deterrence.

N.J.S.A. 2C:44-1a(3), (6) and (9). Because of defendant's advanced

kidney disease for which he was receiving dialysis treatment, the

judge found the applicability of mitigating factor (11) the

imprisonment of defendant would entail excessive hardship.

N.J.S.A. 2C:44-1b(11). The judge found a substantial

preponderance of aggravating factors. Defendant does not dispute

those findings by Judge Guida.

 This, of course, would have justified at least a mid-range

base term of fifteen years up to the twenty-year maximum for a

 18 A-0070-15T3
first-degree crime. However, because of the plea agreement,

defendant was given the benefit of the bottom-of-the-range ten-

year base term. In these circumstances, we find no abuse of

discretion in the imposition of a period of parole ineligibility

of five years, rather than the three-and-one-third years defendant

seeks.

 Pursuant to N.J.S.A. 2C:44-5h, when a defendant is sentenced

for an offense committed while released pending disposition of a

previous offense,

 the term of imprisonment shall run
 consecutively to any sentence of imprisonment
 imposed for the previous offense, unless the
 court, in consideration of the character and
 conditions of the defendant, finds that
 imposition of consecutive sentences would be
 a serious injustice which overrides the need
 to deter such conduct by others.

Defendant argues that Judge Guida did not give adequate

consideration to whether or not defendant satisfied the serious

injustice test. Defendant seeks a remand for further consideration

of the issue. We do not agree.

 Judge Guida expressed his reasons for finding that the serious

injustice test was not satisfied. In doing so, he gave due

consideration to defendant's serious medical condition. His

stated reasons included the following:

 I also find that he is suffering from late-
 stage or end-stage kidney disease which

 19 A-0070-15T3
 apparently is being treated at the prison
 facility. To the extent that he's performing
 now -- he appears to be healthy and I -- I say
 that exteriorly; I don't know what's going on
 inside him. He's able to communicate with
 me, answer questions and gave me a statement
 as to his position which was actually
 eloquent, and also indicating from the records
 that were given to me or the letters that were
 given to me, certificates that he's able to
 be a mentor in the prison. So while it is a
 hardship, I don't find that it is an extreme
 hardship in that regard.

 The judge did not err in finding that defendant had not

satisfied the very high standard required to trigger the exception

to the presumptive consecutive sentencing requirement of N.J.S.A.

2C:44-5h. We are satisfied that the judge's findings regarding

aggravating and mitigating factors were based on competent and

credible evidence in the record, he correctly applied the

sentencing guidelines set forth in the Code of Criminal Justice,

and the sentence imposed was not excessive or unduly punitive and

did not constitute an abuse of discretion. State v. O'Donnell,

117 N.J. 210 (1989); State v. Gertler, 114 N.J. 383 (1989); State

v. Roth, 95 N.J. 334 (1984).

 Affirmed.

 20 A-0070-15T3