**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4139-17T3
               A-5085-17T3
               A-5677-17T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SHAQUILLE JOHN, a/k/a
JOHN SHAQUILLE,

     Defendant-Appellant.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MICHAEL ATKINSON,

     Defendant-Appellant.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAHID T. WATSON, a/k/a
JAHAD T. WATSON,
JAHID T. WATTSON,
JIHAD WATSON, and
JAHID GREEN,

       Defendant-Appellant.

_____

Submitted (A-4139-17/A-5677-17) and
Argued (A-5085-17) December 1, 2020 –
Decided December 15, 2020

Before Judges Haas and Mawla.

On appeal from the Superior Court of New Jersey,
Law Division, Union County, Indictment No. 15-03-
0210.

Joseph E. Krakora, Public Defender, attorney for
appellant Shaquille John (Michael A. Priarone,
Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for
respondent in A-4139-17 (Sarah C. Hunt, Deputy
Attorney General, of counsel and on the brief).

Michele E. Friedman, Assistant Deputy Public
Defender, argued the cause for appellant Michael
Atkinson (Joseph E. Krakora, Public Defender,
attorney; Michele E. Friedman, of counsel and on the
briefs).

Catlin A. Davis, Deputy Attorney General, argued the
cause for respondent in A-5085-17 (Gurbir S. Grewal,

Attorney General, attorney; Catlin A. Davis, of counsel and on the brief).

Appellant Michael Atkinson filed a pro se supplemental brief.

Joseph E. Krakora, Public Defender, attorney for appellant Jahid T. Watson (Amira R. Scurato, Designated Counsel, on the brief).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent in A-5677-17 (Meredith L. Balo, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs).

Appellant Jahid T. Watson filed a pro se supplemental brief.

PER CURIAM

In these three appeals, calendared back-to-back and consolidated for purposes of this opinion, defendants Shaquille John, Michael Atkinson, and Jahid Watson appeal from the Law Division's order denying their motion to suppress evidence seized in a police search of a motel room. Having considered defendants' arguments in light of the record and applicable law, we affirm.

I.

On March 13, 2015, a Union County grand jury returned a ten-count indictment charging defendants with first-degree robbery in violation of

3

N.J.S.A. 2C:15-1(b) (count one); second-degree conspiracy to commit robbery in violation of N.J.S.A. 2C:5-2(a)(1) and/or (2) and N.J.S.A. 2C:15-1(b) (count two); first-degree murder in violation of N.J.S.A. 2C:11-3(a)(1) and/or (a)(2) (count three); first-degree felony murder in violation of N.J.S.A. 2C:11-3(a)(3) (count four); first-degree attempted murder in violation of N.J.S.A. 2C:5-1(a)(1)/N.J.S.A. 2C:11-3(a)(1) (count five); second-degree unlawful possession of a handgun in violation of N.J.S.A. 2C:39-5(b)(1) (count six); second-degree unlawful possession of an assault firearm in violation of N.J.S.A. 2C:39-5(f) (count seven); fourth-degree possession of a large capacity ammunition magazine in violation of N.J.S.A. 2C:39-3(j) (count eight); and second-degree possession of a weapon for an unlawful purpose in violation of N.J.S.A. 2C:39-4(a) (count nine). The indictment also charged Watson separately with first-degree promoting organized street crime in violation of N.J.S.A. 2C:33-30(a) (count ten).

In January 2016, John filed a motion to suppress the evidence seized during the search of the motel room, and the other defendants joined the motion. Following a multi-day hearing, Judge Regina Caulfield denied the motion and rendered a thorough forty-page written decision explaining the bases for her rulings.

On March 15, 2018, defendants each pled guilty to first-degree aggravated manslaughter in violation of N.J.S.A. 2C:11-4(a)(1) under an amended count three.[1]  Judge Caulfield sentenced:  (1) John to twenty-two years in prison, subject to the 85% parole ineligibility provisions of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2;  (2) Atkinson to eighteen years in prison, subject to NERA; and (3) Watson to an aggregate twelve-year term subject to NERA.  The judge also required each defendant to complete a five-year period of parole supervision upon release.  These appeals followed.

On appeal, John raises the following contentions:

[POINT] I

THE ASSAULT RIFLE WAS SEIZED DURING AN ILLEGAL ENTRY INTO THE MOTEL ROOM AND IN THE COURSE OF AN ILLEGAL SEARCH OF THE ROOM AND ARREST OF THE OCCUPANTS WITHOUT A WARRANT AND WITHOUT PROBABLE CAUSE AND THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS THE RIFLE.

Atkinson presents the following arguments:

POINT I

THE MOTION COURT COMMITTED REVERSIBLE ERROR IN DENYING THE MOTION

---

[1]  Watson also pled guilty to a charge of third-degree aggravated assault under a separate indictment.

5

TO SUPPRESS EVIDENCE SEIZED IN THE MOTEL ROOM, BECAUSE ANY EXIGENCY WAS TOO ATTENUATED TO EXTEND TO THE MOTEL. MOREOVER, BECAUSE POLICE TRAVELED TO, AND ENTERED THE MOTEL ROOM WITH THE EXPRESS PURPOSE OF INVESTIGATING A SHOOTING, THEY DID NOT DISCOVER THE GUN INADVERTENTLY.

A. No Exigency Existed With Respect to the Spring Lane Motel Room.

B. The Plain View Doctrine is Inapplicable Because the Officer's Discovery of the Gun Was Not Inadvertent; the Police Specifically Went to the Motel to Investigate a Gun Offense.

POINT II

UNDER STATE V. KING[, 44 N.J. 36 (1965)] AND THE TOTALITY OF THE CIRCUMSTANCES, . . . [CO-DEFENDANT SNEED] DID NOT VOLUNTARILY CONSENT TO THE SEARCH OF THE HOME AND MOTEL ROOM.

Watson raises these contentions:

POINT I

THE TRIAL COURT ERRED BY DENYING THE MOTION TO SUPPRESS A RIFLE SEIZED AFTER OFFICERS CONDUCTED A WARRANTLESS SEARCH OF A MOTEL ROOM. U.S. CONST., AMENDS. IV, XIV; N.J. CONST., ART. I, PAR. 7.

A. The Legal Standard for a Motion to Suppress.

6

B.     No Probable Cause, Exigency, or Inadvertence Existed Under These Facts.

C.     The Consent to Search was Invalid as no Basis Existed to Seek Consent and the Consent Given was Involuntary.

Finally, Atkinson and Watson have each filed virtually identical pro se supplemental briefs, in which they raised the following argument:

POINT [I]

THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING THE MOTION TO SUPPRESS EVIDENCE SEIZED DURING A WARRANTLESS SEARCH OF A MOTEL ROOM WITHOUT PROBABLE CAUSE, WHICH VIOLATED THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION, AND THE GREATER PROTECTIONS AFFORDED UNDER THE STATE CONSTITUTION, THEREFORE THE CONVICTION SHOULD BE REVERSED.

II.

The essential facts of this case are set forth in detail in Judge Caulfield's comprehensive opinion and we incorporate her recitation of that history. Therefore, we need only summarize the most salient facts here.

At approximately 9:00 p.m. on December 5, 2014, Detective Alfonso Colon received a telephone call from an anonymous citizen, who reported hearing multiple shots fired in a home on Bond Street. The caller reported

7

seeing two or three individuals carrying another person out of the house. The citizen also saw a man and a woman taking duffel bags or suitcases from the house and placing them in a shed. Detective Colon passed this information along to dispatch, which informed him that Sergeant Julian Hilongos was investigating the report and that a shooting victim had been brought to the hospital.

About ten or fifteen minutes later, the citizen called Detective Colon a second time. She told the detective a cab had come to the house on Bond Street and a man and woman carrying large bags got into it and left the premises. Detective Colon forwarded this information to Sergeant Hilongos.

At the hospital, two police officers attempted to interview the shooting victim, but he was not cooperative. However, the victim's mother and his former girlfriend both identified the victim as defendant Watson. The girlfriend reported that Watson called her after he was shot, and she picked him up near the home on Bond Street and drove him to the hospital. Another individual, later identified as co-defendant Myles Sneed, accompanied Watson to the hospital, but he jumped out of the car as soon as it arrived and left the scene.

A-4139-17T3

Sergeant Hilongos directed the two officers to go to Bond Street to locate the house where the shooting occurred. When they were not able to do so, they returned to the station. Once there, the officers learned that a taxi had been at a home on that street, and called to get the address. The taxi company confirmed that one of its drivers had picked up a man and a woman at a specific home on Bond Street and had taken them to a motel on Routes 1 and 9, and then to the Spring Lane Motel.

Because he was concerned that the bags the couple were carrying might contain additional victims or weapons, Sergeant Hilongos called for additional units, including four members of the Emergency Services Unit (ESU), to check for victims or suspects at the Bond Street home and at the Spring Lane Motel. He held a briefing for the team around 12:15 a.m. The sergeant and the ESU went to the Bond Street home, while another group of officers, including Officer Eduardo Andino, went to the motel.

At the Bond Street home, the ESU found a large amount of blood on the bottom panel of the screen door. The police knocked, announced their presence, and entered the home. The police did not locate any victims or other individuals in the home, but found blood on the kitchen floor and on the last

step before the second-floor landing. The officers then secured the home so they could obtain a search warrant.

Meanwhile, Officer Andino and the other members of his team had arrived at the motel about thirty minutes after the briefing. They went to the front office and the night manager allowed them to watch about twenty minutes of surveillance footage. From the video, the officers learned that a man and a woman matching the description given by the citizen had arrived at the motel in a taxi around 10:40 p.m. They carried bags they took from the cab into the motel room. The officers shared this information with Sergeant Hilongos.

Believing that these individuals had been present at the scene of the shooting and might be carrying weapons, Sergeant Hilongos instructed the ESU to report to the motel. The team arrived about seven minutes later. Once at the motel, the officers knocked on the door and announced their presence. After a couple of minutes, the woman opened the door. The police arrested the woman, later identified as co-defendant Nicole Robbins, and the man she was with, who was later determined to be co-defendant Sneed. The ESU conducted a protective sweep of the room and, in the bathroom, the officers found a rifle.

A-4139-17T3

The officers then secured the room in anticipation of applying for a search warrant.

Sneed later consented to a search of the motel room which he had rented, and of the house on Bond Street, where he had been staying for some time. After Sneed signed the written consent form, the police searched the motel room and found "an extended magazine clip," some marijuana, the key and receipt for the room, and approximately $900 in cash.

Sometime thereafter, the State was able to connect the rifle found in the motel bathroom to an armed robbery of a bodega that occurred on October 19, 2014. During the robbery, three individuals had entered the store, and two of the robbers began shooting their weapons. As a result, the robbers killed one victim and wounded another. Shell casings found at the scene matched the rifle's shell casings.

After Judge Caulfield denied their motion to suppress the rifle from being admitted in evidence at trial, each defendant pled guilty to one count of aggravated manslaughter. In their plea colloquies, John and Atkinson testified they carried and shot their weapons during the robbery. Watson admitted he "planned and participated in" the robbery.

A-4139-17T3

## III.

In her well-reasoned decision, Judge Caulfield first found that the police properly entered the home on Bond Street without a warrant under the officers' community-caretaking and emergency aid doctrines. Under the community-caretaking doctrine, "[c]ourts have allowed warrantless searches . . . when police officers have acted not in their law enforcement or criminal investigatory role, but rather in a community[-]caretaking function." State v. Bogan, 200 N.J. 61, 73 (2009). "In performing these tasks, typically, there is not time to acquire a warrant when emergent circumstances arise and an immediate search is required to preserve life or property." State v. Edmonds, 211 N.J. 117, 141 (2012). Our Supreme Court has held, however, that the community-caretaking doctrine prohibits "the warrantless entry into or search of a home in the absence of some form of exigent circumstances" or "objectively reasonable emergency." State v. Vargas, 213 N.J. 301, 305, 321 (2013).

The Court also made clear that "[p]olice officers serving in a community-caretaking role are empowered to make a warrantless entry into a home under the emergency-aid exception to the warrant requirement." Id. at 323. The emergency-aid doctrine, first enunciated in State v. Frankel, 179 N.J.

586 (2004), and later modified in Edmonds, "is derived from the commonsense understanding that exigent circumstances may require public safety officials, such as the police, . . . to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious injury." State v. Hathaway, 222 N.J. 453, 469 (2015) (emphasis omitted) (quoting Frankel, 179 N.J. at 598).

Courts apply a "two-prong test" that considers "the totality of the circumstances" to determine whether the emergency-aid doctrine justifies a warrantless search of a home. Id. at 470, 472. To that end, the State must show that "(1) the officer had an objectively reasonable basis to believe that an emergency require[d] that he provide immediate assistance to protect or preserve life, or to prevent serious injury and (2) there was a reasonable nexus between the emergency and the area or places to be searched." Id. at 470 (alteration in original) (quoting Edmonds, 211 N.J. at 132). The doctrine does not require "certitude" of danger but only reasonable belief that immediate action is required. Ibid. (quoting Frankel, 179 N.J. at 599). Reasonableness turns on the circumstances at the time and "does not depend on whether it is later determined that the danger actually existed." Ibid.

If an emergency exists, "[t]he emergency-aid doctrine, particularly when applied to the entry of a home, must be 'limited to the reasons and objectives that prompted' the need for immediate action." Edmonds, 211 N.J. at 134 (quoting Frankel, 179 N.J. at 599). "Therefore, police officers looking for an injured person may not extend their search to small compartments such as 'drawers, cupboards, or wastepaper baskets.'" Hathaway, 222 N.J. at 470 (quoting Frankel, 179 N.J. at 599). "If, however, contraband is 'observed in plain view by a public safety official who is lawfully on the premises and is not exceeding the scope of the search,' that evidence will be admissible." Ibid. (quoting Frankel, 179 N.J. at 599-600). "When the exigency that justifies immediate action dissipates, the rationale for searching without a warrant is no longer present." Edmonds, 211 N.J. at 134.

Applying these principles, Judge Caulfield found

> that the officers had a reasonable basis to believe that there was an injured person at [the Bond Street home]. As Sergeant Hilongos testified, blood was visible on the door to the home. A concerned citizen had reported hearing shots fired from or near the house. Thus, the officers had a reasonable and objective basis to believe that there might have been an injured person or persons inside the home. For those reasons, they were permitted to enter the house under the emergency aid exception to the warrant requirement. Once inside, the officers conducted a limited search

during which they found more blood, confirming that someone had been injured inside the home.

The judge then turned to the search of the motel room that occurred shortly after the police cleared the house on Bond Street. After reviewing all of the circumstances surrounding the search, Judge Caulfield concluded that the police properly entered the room without a warrant because they had probable cause that evidence of a crime would be found in the room, and there were exigent circumstances supporting the need to immediately enter the room.

It is well established that "[p]robable cause is a flexible, nontechnical concept" requiring the "balancing of the governmental need for enforcement of the criminal law against the citizens' constitutionally protected right of privacy." State v. Kasabucki, 52 N.J. 110, 116 (1968). Generally, probable cause is understood to mean "less than legal evidence necessary to convict though more than mere naked suspicion." State v. Sullivan, 169 N.J. 204, 210-11 (2001) (citation omitted). "When determining whether probable cause exists, courts must consider the totality of the circumstances, and they must deal with probabilities." Schneider v. Simonini, 163 N.J. 336, 361 (2000) (citing Illinois v. Gates, 462 U.S. 213, 230, 238 (1983)).

As Judge Caulfield noted, the police here relied upon two reports received from a concerned citizen. Our Supreme Court has noted that an ordinary citizen reporting a crime to the police is not viewed with suspicion, and courts assume that a further demonstration of reliability is not necessary to justify a stop of the person identified in the citizen's report. State v. Basil, 202 N.J. 570, 586 (2010) (citing State v. Amelio, 197 N.J. 207, 212 (2008)). "Thus, an objectively reasonable police officer may assume that an ordinary citizen reporting a crime, which the citizen purports to have observed, is providing reliable information." Ibid. (citing State v. Stovall, 170 N.J. 346, 362 (2002)). "There is an assumption grounded in common experience that such a person is motivated by factors that are consistent with law enforcement goals." State v. Davis, 104 N.J. 490, 506 (1986).

After considering these factors, the judge found that the citizen's reports, which the police were able to corroborate, provided the officers with

> probable cause to believe that a shooting had occurred at [the Bond Street home] and that the room at the motel contained evidence of that shooting. Given the concerned caller's information, it was reasonable for the officers to believe that the two individuals at the motel were potential suspects in the shooting. Moreover, it appears that these two individuals may have taken evidence from the [Bond Street home] crime scene to the motel room. Indeed, the concerned caller observed two individuals removing possible

16

evidence from [the Bond Street home] shortly after the shooting. Based upon the above, there was clearly a "fair probability" that evidence of the shooting would be found in the motel room.

In addition to concluding that the police had probable cause to search the motel room, Judge Caulfield also determined that the exigent circumstances that existed the night of the shooting fully supported their choice to proceed in the absence of a warrant. In determining that exigent circumstances were present, the judge considered the following factors as required by our Supreme Court's decision in State v. Walker:

> the degree of urgency and the amount of time necessary to obtain a warrant; the reasonable belief that the evidence was about to be lost, destroyed, or removed from the scene; the severity or seriousness of the offense involved; the possibility that a suspect was armed or dangerous; and the strength or weakness of the underlying probable cause determination.
>
> [State v. Walker, 213 N.J. 281, 292 (2013) (quoting State v. Deluca, 168 N.J. 626, 632-33 (2001)).]

In finding that the circumstances confronting the officers were exigent, the judge pointed to the fact that "the officers were investigating a serious crime involving a shooting." At that point, "[t]he gunman was still at large and the gun used in Watson's shooting was missing. Thus, the police had an

17

immediate and urgent need to locate the shooter and the weapon before other members of the public were harmed."

In addition, the judge observed that "the officers had reason to believe that the two individuals in the motel room were armed" and ample "reason to be concerned about the welfare of other occupants of the motel." The judge found that the police were also concerned the individuals in the room were attempting to conceal contraband. Under these circumstances, Judge Caulfield ruled "that there was sufficient exigency to justify the warrantless search of the motel room."

The judge rejected defendants' argument that too much time had passed since the shooting at the Bond Street home to permit the situation at the motel room to be deemed exigent. The judge noted that Officer Andino did not arrive at the motel until 12:45 a.m. The officers then watched the surveillance video and called for the ESU team to come to the motel. The officers entered the room at approximately 1:30 a.m. Thus, Judge Caulfield held that "[t]he limited time between the shooting at the house on Bond Street and the warrantless entry into the motel room created a substantial likelihood that the motel occupants were still armed and potentially dangerous."

18

Judge Caulfield also found that due to the exigent circumstances, the police were not required to obtain a telephonic warrant before entering the motel room.  As the judge explained:

> [T]he officers were only able to confirm that the individuals in the Spring Lane Motel were somehow involved in the shooting late at night.  Securing a telephonic warrant would certainly have required additional time after midnight which would have had the potential to create a safety risk to the police or public . . . .  Waiting for a warrant might have alerted the occupants of the motel room to the officers' presence which could have created a dangerous situation for both the police and the public.

The judge ruled that the protective sweep the police conducted after entering the motel room was properly limited in scope.  Police officers are allowed "to conduct a limited 'protective sweep' of a residence when necessary for safety reasons."  State v. Gamble, 218 N.J. 412, 426 (2014) (citation omitted).  A protective sweep is "a quick and limited search of premises, . . . and conducted to protect the safety of police officers or others[,] . . . narrowly confined to a cursory visual inspection of those places in which a person might be hiding."  Ibid. (alteration in original).

Thus, Judge Caulfield found that the police properly checked the bathroom to see if anyone was hiding there.  Once they entered the bathroom,

the officers saw the rifle in plain view.  The plain view exception to the warrant requirement has three elements:

> (1) "the police officer must be lawfully in the viewing area"; (2) "the officer has to discover the evidence 'inadvertently,' meaning that he did not know in advance where evidence was located nor intend beforehand to seize it"; and (3) "it has to be 'immediately apparent' to the police that the items in plain view were evidence of a crime, contraband, or otherwise subject to seizure."[2]
>
> [State v. Reininger, 430 N.J. Super. 517, 535-36, (App. Div. 2013) (quoting State v. Bruzzese, 94 N.J. 210, 236 (1983)).]

Judge Caulfield found that prongs one and three of the plain view exception were met because the police properly entered the motel room to conduct a protective sweep due to the exigent circumstances confronting them. In addition, it was "immediately apparent" that the rifle was contraband.

Defendants argued that the discovery of the rifle was not inadvertent because the police entered the motel room to determine whether it contained evidence of the shooting on Bond Street.  However, Judge Caulfield found that "the discovery of the assault rifle was inadvertent as the officers had no advance knowledge that a weapon would be in the bathroom."

---

[2]  On November 15, 2016, our Supreme Court held prospectively "that an inadvertent discovery of contraband or evidence of a crime is no longer a predicate for a plain-view seizure."  State v. Gonzales, 227 N.J. 77, 82 (2016).

Finally, the judge rejected defendants' contention that Sneed did not knowingly and voluntarily consent to the search of the Bond Street home and the motel room.  As Judge Caulfield explained, in State v. King, 44 N.J. 346, 352 (1965), our Supreme Court set forth various non-exhaustive factors to guide the analytical framework, and concluded that in order for a search "[t]o be voluntary, the consent must be 'unequivocal and specific' and 'freely and intelligently given.'" (Citation omitted).  In her written decision, the judge considered all of the King factors and found "that the atmosphere surrounding Sneed's consent was not inherently coercive."

## IV.

On appeal, defendants raise the same arguments they unsuccessfully presented to Judge Caulfield.  Defendants again assert that the police improperly entered the motel room without probable cause to do so.  They contend that the circumstances were not sufficiently exigent to permit the police to look for victims of the shooting, weapons, or other evidence of the crime.  Defendants also repeat their argument that the rifle was not found "inadvertently" under the plain view exception to the warrant requirement. Finally, they allege that Sneed's written consent to the search of both the home and the motel room was not voluntary.

As discussed above, however, Judge Caulfield considered each and every one of these contentions and rendered a thoughtful written decision fully explaining all of her rulings. When reviewing an order denying a motion to suppress evidence, we accept a trial judge's findings of fact if they are supported by sufficient credible evidence in the record. Gamble, 218 N.J. at 424 (citing State v. Elders, 192 N.J. 224, 243 (2007)). Deference should be afforded to a trial judge's findings when they are "substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964). If the trial court's decision is based upon a legal conclusion, "we conduct a de novo, plenary review." State v. Rockford, 213 N.J. 424, 440 (2013) (citations omitted).

Applying these principles, we conclude that Judge Caulfield's factual findings are fully supported by the record and, in light of those facts, her legal conclusions are unassailable. We therefore affirm substantially for the reasons set forth in the judge's forty-page written decision.[3]

---

[3] We note that the State has argued in all three appeals that defendants lacked standing to challenge the admissibility of the rifle because they did not have a reasonable expectation of privacy in the motel room. However, as Judge Caulfield stated in her opinion, the State consented to defendants' participation

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

at the suppression hearing.    Therefore, we need not address the State's argument.

A-4139-17T3